## JOHN BAKHAUS *vs.* THE CALEDONIAN INSUR-
## ANCE COMPANY.

*Fire Insurance—Waiver of Proof of Loss—Evidence—Loss*
*Payable to Insured as Interest May Appear—Waiver of*
*Condition as to Sole Ownership—Pleading— Con-*
*solidation of Actions—Permission to Complete*
*Building a Waiver of Condition as*
*to Vacancy.*

The provisions in a policy of fire insurance restricting the power
of agents to waive the conditions have reference to conditions
that form a part of the contract, and do not refer to stipu-
lations to be performed after a loss has occurred.

When statements made by an insurer to the insured after a loss
induced the latter to believe that the formal proofs of loss
mentioned in the policy would not be required of him, and
acting upon that belief, he refrained from filing proofs of
loss within the time limited by the policy for so doing, these
circumstances constitute a waiver by the insurer of the formal
proofs.

Two days after a fire had destroyed certain buildings covered
by policies of insurance, an agent of the insurer and its ad-
juster visited the premises, questioned the insured concerning
the property and its destruction, at a subsequent interview
further discussed the matter and directed the insured to make
a statement under oath to the Fire Marshal, and then told the
insured that he would hear from the adjuster. *Held*, that
these facts are legally sufficient evidence to show that the con-
duct of the agent of the insurer induced the insured to be-
lieve that proofs of loss would not be required, and that the
company would either settle the loss or deny all liability.

Evidence that according to the general custom the insurance
adjuster furnishes the insured with blank proofs of loss unless
he determines not to pay the same, is admissible in connec-
tion with other evidence as to the conduct of the insurer
which induced the insured to believe that proofs of loss would
not be required.

A policy of fire insurance was issued to A. alone, but it contained a rider or addition saying, "loss if any payable to the assured as interest may appear." The policy provided that it would be void, unless otherwise provided by agreement endorsed thereon, if the interest of the insured be other than unconditional and sole ownership, or if the interest of the insured be not truly stated. The property insured belonged to A. and his wife as tenants by the entireties, and there was a mortgage on it. *Held,* that the effect of making the loss payable to the insured as his interest may appear was to waive the conditions of the policy requiring the insured to be the sole owner and that his interest should be as stated.

When a demurrer to a plea or replication is sustained, but the pleader gets the full benefit of his defense or reply by an amneded plea or replication, he is not prejudiced by the ruling on the demurrer, even if the Court erred.

When two different policies of fire insurance are issued by the same company on adjoining properties destroyed by the same fire, and two actions are brought on the policies, the Court may order the cases to be consolidated by virtue of Code. Art. 50, sec. 8.

In an action on a policy of fire insurance, the plaintiff cannot be asked if he knew that formal proofs of loss were necessary.

Evidence that the plaintiff had knowledge, before consulting counsel, that the insurance company would refuse to pay his claim is immaterial.

At the time a policy of fire insurance on certain houses was issued, the buildings were not finished. That fact was then known to the agent of the insurer, and they were burned before completion. The policy contained a provision that it should be void if the building insured be or become vacant or unoccupied and so remain for ten days. Endorsed on the policy was permission to make alterations, additions and completions. *Held,* that the effect of this permission to complete the buildings was to waive the provision of the policy requiring the houses to be occupied and that condition would not apply until the houses were ready for occupancy.

*Decided March 31st, 1910.*

Appeal from the Baltimore City Court (HARLAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*S. S. Field* (with whom were *Wm. F. Pirscher* and *Gill & Preston* on the brief), for the appellant.

*W. Calvin Chesnut* and *J. Morfit Mullen* (with whom were *Gans & Haman* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

In 1901, John Bakhaus, the appellant, and his wife, who for fifteen years, and practically ever since they came to America, had been engaged in keeping a stall in Cross Street Market, in Baltimore City, where they sold smoked fish, eels and "German Produce," purchased for $575.00, an unimproved lot in Brooklyn, Anne Arundel County, near Baltimore, containing about three acres of land, on which, a year later, they gave a mortgage for $350.00. In 1904 they erected on a portion of this lot, on the corner of Sixth street and Stools road, a dwelling house, said to be worth $1,500 or $1,600, in which they resided with their children at the time of the fire hereinafter referred to. In April, 1907, they began the erection of six other dwelling houses on said lot, the nearest of them being about thirty feet from their dwelling. They were not built by contract, but the appellant and his wife purchased the materials and employed the carpenters and other mechanics, the appellant and his son, who was seventeen years of age, assisting in the work. The condition of these houses, which were unoccupied and, with their dwelling were destroyed by fire on January 19th, 1908, is described in the record as follows: "The six houses were all under roof, three were plastered and painted and ready for occupancy, except that the porches were not built and yards were not fenced; lumber for porches and fences was there; and three

were lathed but not plastered or painted on the inside; all six were painted on the outside; the doors were all on or fitted and standing in the houses and were burnt; the shutters were in the dwelling and were saved; the houses were two stories and basement containing four rooms, basement kitchen and cellar, or counting the cellar, six rooms in all; these houses were all frame; the nearest of them was about thirty feet from his dwelling; none of the porches had been put up and the lumber which was intended for the porches was piled between the six houses and the dwelling and was removed by them at the time of the fire and not burnt."

At the time of the fire there were two policies of fire insurance on the dwelling in which the appellant and his family resided, one issued by the German Insurance Company to the appellant and his wife, for $500.00 on the dwelling, and $350.00 on their furniture, and the other by the Caledonian Insurance Company, May 3rd, 1905, for three years, in favor of the appellant for $500.00; and there were also two policies on the six dwelling houses, one for $3,000.00 to the appellant and his wife, issued by the Germania Fire Insurance Company, and the other issued by the Caledonian Insurance Company, November 27th, 1907, in favor of the appellant, for $1,200.00 or $200.00 on each house. The German Insurance Company settled with the appellant and his wife the loss occasioned by said fire, but the Caledonian Insurance Company, through Thomas E. Bond, its adjuster, notified the appellant by letter, dated April 6th, 1908, that it denied liability under its said policies, and on the 9th of May the appellant brought two suits against the appellee, one on the $500.00 policy and the other on the $1,200.00 policy.

These policies contain the usual clauses found in the New York Standard Fire Insurance Policies, requiring the insured to give written notice of a loss; to furnish, within sixty days after the fire, unless the time is extended in writing by the company, proofs of loss, and providing that the amount of loss, as ascertained in accordance with the terms of the policy, shall be payable sixty days after satisfactory

proofs of loss, etc., have been received by the company. They also contain the following conditions:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss..

"This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void * * * if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee-simple; * * * or if a building herein described, whether intended for occupancy by owner or tenant, be or become vacant or unoccupied and so remain for ten days.

"No suit or action on this policy, for the recovery of any claim, shall be sustainable in any Court of law or equity until after full compliance by the insured with all the foregoing requirements, nor unless commenced within twelve months next after the fire."

There was also added to the policies the following warranty: "Warranted by the assured that this dwelling shall be occupied by a family during the life of this policy, which shall not be construed as meaning the occupancy of an apartment or apartments by a man or men, and which, however, shall not prejudice assured's right to the ten (10) days' vacancy permitted by the conditions of this policy."

In the first case the defendant pleaded "never promised as alleged" and that it "never was indebted as alleged," and, relying upon the above provisions of the policy, set up the further defenses: first, that the plaintiff did not furnish the proofs of loss as required by the policy; second, that the interest of the insured in the property was not truly stated in the policy, the policy having been made to the plaintiff

alone, whereas the property belonged to the plaintiff and his wife as tenants by the entireties; third, that the plaintiff was not the unconditional and sole owner of the property, as required by the policy, and that said provision of the policy had not been modified by any agreement added to or endorsed thereon; and, fourth, that at the time of the execution of the policy, and at the time of the fire, there was a mortgage on the property for $350.00, which fact was concealed by the plaintiff and was not stated in the policy, and that, therefore, the interest of the insured in the property was not truly stated in the policy. In the second case, in addition to the pleas relied on in the first case, the defendant further alleged: first, that the buildings remained vacant and unoccupied for more than ten days, and had never been occupied by families as required by the policy; second, that the plaintiff, at the time of the execution of said policy, represented that the houses were occupied by tenants, whereas said houses were not so occupied; and, third, that at the time of the execution of said policy the plaintiff represented to the defendant that there was $300.00 insurance on each of the houses, whereas there was $500.00 insurance on each of the houses, and that said representations were as to material facts, were relied on by the defendant and were fraudulently made. Issues were joined on the first and second pleas, and to the other pleas the plaintiff replied: first, that the defendant waived the furnishing of proofs of loss; second, that there were attached to said policies riders containing the following provision: "Loss if any payable to the assured as interest may appear," and that he did not conceal the existence of said mortgage or make any misrepresentation concerning the same; third, that the houses covered by the policy for $1,200.00 "were in course of construction at the time the policy was issued; that the defendant's agent saw them and knew it,—that the fire occurred before they were completed and ready for occupancy, and the policy contained the following endorsement: 'Permission to make alterations, additions, completions and repairs and this policy to cover materials on premises for mak-

ing same;'" fourth, that he did not represent to the defendant at the time of the issuing of the policy that the houses therein mentioned were occupied by tenants, and that the agent of the defendant knew that the houses were not occupied and were not completed or ready for occupancy; and, fifth, that he did not represent to the defendant at the time the policy was issued that there was $300.00 insurance on each of the houses, and that he told the defendant's agent that there was $500.00 insurance on each house.

There are numerous pleas, replications and rejoinders, occupying a large part of the record, but the above statement of the pleadings is sufficient to indicate the defenses relied on by the defendant, the contentions of the parties, and the more important questions to be determined on this appeal.

The record contains five exceptions, the first is to the order of the Court consolidating the two cases, the second, third and fourth to rulings on the evidence, and the fifth to the granting of the defendant's second prayer. At the conclusion of the testimony produced by the plaintiff the defendant offered the following prayers:

1. At the request of the defendant, the Court instructs the jury that under the pleadings in this case, there is no evidence legally sufficient to entitle the plaintiff to recover, and the verdict must, therefore, be for the defendant.

2. At the request of the defendant, the Court instructs the jury that by the uncontradicted evidence in this case, the plaintiff did not furnish to the defendant the proofs of loss required to be rendered by the plaintiff to the defendant under each policy sued on, and there being no evidence in this case legally sufficient to show any waiver by the defendant of this requirement of the policies, the verdict of the jury must be for the defendant.

3. At the request of the defendant, the Court instructs the jury that with respect to the $1,200.00 policy offered in evidence, the same contained a warranty that the insured premises should be occupied by a family during the life of the policy (except that ten days vacancy was permitted), and

that by the uncontradicted evidence the insured property was not occupied by a family for a period of more than ten days preceding the fire; and that there is no evidence in this case legally sufficient to show any waiver by the defendant of this warranty, and that, therefore, there is no evidence in this case legally sufficient to entitle the plaintiff to recover against this defendant on said $1,200 policy.

4. The defendant prays the Court to instruct the jury that under the pleadings there is no evidence in this case legally sufficient to show any value of the plaintiff's interest in the property destroyed by fire, and for the damage to which this suit is brought, and that therefore, the jury can award the plaintiff only nominal damages.

The Court rejected the first, third and fourth prayers but granted the second prayer, instructing the jury that there was no evidence legally sufficient to show a waiver by the defendant of the provision of the policies requiring the plaintiff to furnish proofs of loss. The verdict and judgment were accordingly in favor of the defendant, and from that judgment this appeal was taken.

The first important question to be considered relates to the granting of that instruction. It is conceded that the plaintiff did not furnish proofs of loss, and that, under the terms of the policies, unless there was evidence of a waiver of the provisions requiring him to do so, there was no error in the Court's ruling.

It is said in 13 *Am. & Eng. Ency. of Law,* 345 (2nd ed.), that: "A great variety of acts and circumstances have been held to constitute waiver of the terms and conditions of policies as to proofs of loss, but these may be brought together under three general heads, namely: First, acts, conduct or statements of the insurer or those representing it by which the insured is induced not to make proofs or to believe that they are not required or will not be insisted on; second, acts or conduct of the insurer or its representatives recognizing its liability and showing an intention not to require proofs or to dispense with them; third, acts or conduct making it

apparent that the furnishing of proofs would be an unnecessary formality and nugatory." It is also said that the waiver may be "by a general agent, and adjuster or special agent of the insurer for adjusting the loss or like losses, or another agent of the insurer acting within the apparent scope of his authority." 13 *Am. & Eng. Ency. of Law,* 350 (2 ed.) ; 19 *Cyc.* 859-860. In the case of *Rokes* v. *Amazon Insurance Co.,* 51 Md. 512, this Court held that proofs of loss are required for the benefit of and may be waived by the insurer, and that it is not "necessary to prove an express agreement to waive," but that "it may be inferred from the acts and conduct of the insurer inconsistent with an intention to insist upon the strict performance of the condition." JUDGE PAGE, in *Hartford F. Ins. Co.* v. *Keating,* 86 Md. 149, referring to the provisions in a policy requiring proofs of loss to be furnished within sixty days, says, "all authorities agree that the condition may be waived, either expressly or by acts and conduct of the insurer himself, or of his agent, having real or apparent authority; and the waiver may be inferred from such acts and conduct as are inconsistent with an intention to insist upon a strict performance." In the case of *Continental Ins. Co.* v. *Reynolds,* 107 Md. 96, JUDGE BURKE, dealing with a provision in the policy making the loss payable sixty days after the furnishing of satisfactory proofs of loss, after stating that the provision was inserted for the benefit of the company, and that it may waive the provision or deny liability under the policy, in either of which events, the insured may bring suit without waiting for the expiration of the time limit, says: "But whether there has been a waiver, an estoppel, or a repudiation of liability under the contract, is a question to be ascertained from the conduct of the insurer and from all the facts and circumstances of the case. * * * And where the evidence tends to show that the company had definitely determined not to pay the loss, or had waived the provision under consideration, or was estopped by its conduct to insist upon it, it would be error to declare as a matter of law that the suit was premature." And it had

been repeatedly held in this State that provisions in policies limiting and restricting the power of agents to waive the conditions and provisions of the policy have reference to conditions and provisions that enter into and form a part of the contract, and which are essential to make it a binding contract, and do not refer to stipulations to be performed after a loss has occurred. *Franklin F. Ins. Co.* v. *Chicago Ice Co.,* 36 Md. 102; *Rokes* v. *Amazon Ins. Co., supra; Farmers' F. Ins. Co.* v. *Baker,* 94 Md. 545; 19 *Cyc.* 360.

It is not necessary to refer to the many cases in this State and elsewhere for illustrations of the application of the doctrine. The rule is well settled, and the question of waiver in any case must depend upon the facts and circumstances of that case. The provisions relating to proofs of loss are, as has been stated, inserted in the policy for the exclusive benefit of the insurer, in order that it may be informed of the nature, character and extent of the loss, and while the insurer may stand on its contract and exact compliance with its terms, there is no reason why these provisions may not be waived by it. The business in which insurance companies are engaged is one in which the security and protection of the insured are largely entrusted to the honesty and fairness of the insurer, and this Court has frequently said that good faith demands of them "frank and open dealing with their policy holders." Any acts or conduct of the insurer, or its representative, that are, under the circumstances, calculated to mislead the insured and to induce him to believe that performance of the condition will not be required, or that proofs of loss would be ineffectual and nugatory, will, if he is thereby misled, amount to a waiver.

Turning to the facts in the case, we find, in addition to what has already been stated, that the fire which caused the loss sought to be recovered in this case, was first discovered by the appellant and his wife while on their way home from Cross Street Market, between twelve and one o'clock Saturday night, January 18th, 1908. The houses and their contents, except the foundations and the furniture, etc., on the

first floor of appellant's dwelling, were completely destroyed. The appellant sent his son to notify the insurance companies, and on the second day after the fire Doctor Brooks, the agent of the appellee from whom the policies in this case were obtained, Mr. Bond, the adjuster for the appellee and the Germania Fire Insurance Company, and Mr. Deming, the adjuster for the German Insurance Company, went to the scene of the fire and asked for the appellant but he was not at home. They measured the foundations of the houses and questioned the appellant's son. Mr. Bond asked him where he was at the time of the fire, "how near the houses were finished," and if the shutters were on the houses. After talking to some of the people in the neighborhood, they told the appellant's son to tell his father to come to Mr. Deming's office the next day. On his way home from Baltimore the appellant met Mr. Bond, Dr. Brooks and Mr. Deming returning to Baltimore, and Mr. Bond and Mr. Deming told him to meet them at Mr. Deming's office the next day. He accordingly went to Mr. Deming's office and there met Mr. Deming, Mr. Bond and Mr. Deming's son. In reply to the question "what took place there," the appellant said: "They asked me how I discovered the fire, and I told them all about it, that I came from town with my wife, and they asked me how far the houses were finished and I told them and how much those houses would cost to finish them and all those questions that Mr. Bond asked me. He asked me who made the concrete foundations, and I told him I did, with two or three men to help me, and he told me I had made a good job of it. And then Mr. Deming told me that I should make a list of the furniture, Mr. Bond told me as he went out, he said, 'You will hear from me.'" The appellant further testified that neither Mr. Bond nor Mr. Deming said anything to him "about making up written proofs about the houses." When asked, "When was the next time you saw Mr. Bond," appellant replied: "It was about eight days afterwards. Me and my wife went to the German Fire Insurance Company and from there they told us we should go to Mr. Deming.

As we came into Mr. Deming's office Mr. Bond was in there but Mr. Bond did not give me any chance to talk with him. Once he saw me and my wife and went out of the door." He stated that the next time he saw Mr. Bond was at the Fire Marshal's office, and when asked how he happened to be in the Fire Marshal's office, he said: "The Deputy Fire Marshal came up there and he ordered me down to his office and I made a statement to him and one day I went to the mail and there was a letter there to John Backhaus from the State Fire Marshal to come up to his office. As I came up there they found out they had the wrong man, that letter was intended for my son, and as I was sitting there Mr. Deming he came and Mr. Bond came out and asked me a lot of questions about the fire, asked how far the houses were finished, and the State Fire Marshal he ordered me out of the door and he says, step out a minute. Mr. Deming went out before that. Then the Fire Marshal came and he said, you can tell your son to come up tomorrow morning about 11 o'clock, and I said alright. But I did not go away, I waited in the corridor and wanted to talk with Mr. Bond. Mr. Bond came out and I asked Mr. Bond, I said: 'What are you going to do about my insurance' and he told me again, he said: 'I cannot do a thing, you will hear from me, I cannot do a thing.'" Appellant stated further that Mr. Bond asked him in the Fire Marshal's office if he knew about the shavings and a barrel; "how it was the doors and shutters were in his dwelling;" if he had left the barrel in one of the houses with shavings in it, and if he had refused to let people in the stables to take the horse out, and that after this conversation with Mr. Bond, he waited to hear from him, and "about fourteen days after I waited and waited and didn't hear anything from Mr. Bond or from anybody, I went up to the German Fire Insurance Company again, and the German Fire Insurance Company sent me to Mr. Deming and Mr. Deming, he was not ready for me then, and I went into Mr. Bond right in Mr. Bond's office. While I came in there Mr. Bond was sitting on the telephone and I asked him again and he says,

I have just been telephoning to Mr. Deming and I am going to see Mr. Deming tomorrow and we will let you know." The appellant did not hear anything further from Mr. Bond until he received the following letters:

"BALTIMORE, April 6th, 1908.

.MR. JOHN BACKHAUS,

Baltimore Maryland.

Dear Sir:

The Caledonian Insurance Company instructs me that it admits no liability under its policy No. 1776827, and hereby tenders you the return of the full amount of premium paid thereon, being the sum of Twelve 00/100 Dollars, which find enclosed.

Please receipt for same on this letter and return to me.

Yours truly,

THOMAS E. BOND,

Adjuster Caledonian Insurance Company."

"BALTIMORE, April 6th, 1908.

.MR. JOHN BACKHAUS,

Baltimore Maryland.

Dear Sir:

The Caledonian Insurance Company instructs me that it admits no liability under its policy No. 1643483, and hereby tenders you the return of the full amount of premiums paid thereon, being the sum of Seven 50/100 Dollars, which find enclosed.

Please receipt for same on this letter and return to me.

Yours truly,

THOMAS E. BOND,

Adjuster Caledonian Insurance Company."

Mr. Hutton, the Deputy Fire Marshal, testified that at the request of Mr. Bond he made an investigation of the burning of the appellant's houses; that he talked with a number of people; that he examined the appellant under oath on the 25th January, 1908, and that his questions and the appellant's answers were written down; that "Mr. Bond was thor-

oughly conversant with everything;" that he, Mr. Bond, read over the statement of the appellant "the same day or the next day after it was taken," and was in the Fire Marshal's office "almost daily relative to the matter." This statement is set out in the record, and not only contains all the information required to be furnished by proofs of loss, but the questions asked the appellant clearly indicate that he was under the suspicion of having set fire to the property. There is also evidence tending to show that according to a general custom the adjuster furnishes the insured with blank proofs of loss, unless he determines not to pay the loss, in which event all discussion and negotiations with the insured cease. This evidence was stricken out on motion of the defendant, but we think it was admissible, not for the purpose of imposing on the insurer an additional obligation, or because the failure of an adjuster to furnish the blanks in accordance with such a custom as the evidence disclosed would, standing alone, amount to a waiver, but in connection with other evidence in the case, as reflecting upon the question whether the conduct of the insurer, or its agent, under the circumstances, induced the insured to believe that proofs of loss would not be required.

From this statement of the facts in the case it is apparent that there was error in the instruction granted. The conduct of the adjuster under the circumstances of this case, could have lead the plaintiff to but one conclusion, namely: that proofs of loss were not required, and that the company would either pay the loss or deny all liability under the policies. He was directed by the adjusters, after they had visited the scene of the fire, to meet them at Mr. Deming's office; he met them there, and after they had discussed the loss, Mr. Deming told him to make out a list of the furniture destroyed, and Mr. Bond told him he would hear from him. He was then required, at the instance of Mr. Bond, to make a statement under oath to the Fire Marshal. Having thus furnished the defendant's adjuster all the information that was required by the terms of the policies; knowing that he was suspected of

having set fire to the property, when Mr. Bond again told him at the Fire Marshal's office that he would hear from him, he had every reason to believe that nothing more would be required of him, and that he had only to wait until the company concluded to either settle the loss or deny liability. Under such circumstances, it cannot be said that there is no evidence of a waiver by the insurer of a condition in the contract the only object of which was to enable it to secure information concerning the nature, character and extent of the loss. *Farmers' Fire Ins. Co.* v. *Baker,* 94 Md., page 555.

The rule that an unqualified denial of liability by an insurance company within the sixty days allowed for filing proofs of loss will constitute a waiver is not denied by counsel for the appellee. For the same reason any other statement or conduct of the insurer within the sixty days that is calculated to mislead the insured and to induce him to believe that proofs of loss will not be required, will, if acted or by the insured, have the same effect.

Since the argument of this case, our attention has been called to the decision, February 1st, 1910, of the U. S. Circuit Court of Appeals in the case of *John Bakhaus and wife* v. *Germania Fire Insurance Co.* In that case the Court was dealing with an entirely different question. There the policy was void at the time of the fire, under the provision prohibiting other insurance, and the Court, applying the rule of the Federal Courts that the doctrine of waiver "can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct, and enforce the conditions," held that, the conduct of the adjuster, after the fire and after the forfeiture of the policy, did not amount to a waiver of the condition. In the opinion delivered by JUDGE BRAWLEY, the Court, referring to the statement of the adjuster to the insured "you will hear from me," says: "If this had been said after the discovery of the over insurance and before the fire, it might have been argued with some

plausibility by the insured that: if you had notified me of the company's intention to insist upon the forfeiture, it would have been in my power to protect myself by other insurance, and it might be claimed that the insured was misled to his prejudice into believing that the company, with full knowledge of the fact, would not insist upon the forfeiture." In the case at bar, at time of the alleged waiver, there had been no forfeiture of the policies, and the reasoning of Judge Brawley, as applied to the question with which we are dealing, does not seem to be in conflict with the views we have expressed.

The policies were issued to the appellant alone, and it appears from the evidence in the case that the property belonged to the appellant and his wife as tenants by the entireties, and that at the time the policies were issued there was a mortgage on the property for $350.00. The appellee contends that the policies were, therefore, void under the conditions requiring the insured to be the unconditional and sole owner, and his interest to be truly stated in the policy, while the appellant insists that these provisions were waived or modified by the riders making the loss payable to the *assured* "as interest may appear."

There can be no doubt as to the meaning or object of these provisions. It is of importance for the insurer to be informed of the nature and extent of the insured's interest, in order that it may judge of the character of the risk. In the case of *Bowman* v. *Franklin Fire Ins. Co.,* 40 Md. 620, JUDGE ALVEY says that: "The great purpose of all such provisions in policies of insurance is to enable the insurer to determine the extent of the risk, and the nature and extent of the interest of the insured in the premises." In *Richards on Insurance,* sec. 237, the author says: "The policy not infrequently insures one or more persons 'as interest may appear.' It is sometimes convenient to use this phrase where the interests are shifting or uncertain; for example, where owner and creditors or lienors desire protection by one policy, or where the owner has died and the vesting of interests may

be ill-defined, or contingent and for a time, perhaps, unrepresented by an executor or administrator, or where owner and tenant require security under the same insurance, or where vendor and vendee wish to be covered during a pending contract of sale in part performed.

"In considering the application and effect of the phrase a clear distinction must be observed between the frequent use of the words 'as interest may appear' in connection with the names of the assured, and the frequent use of the same words in connection with any third party named in the policy as a mere payee or appointee to receive the insurance money. In the latter instance the payee takes only what the assured is entitled to receive, and if the assured has broken a warranty the payee gets nothing." In the case of *Dakin* v. *Liverpool, London & Globe Insurance Company,* 77 N. Y. 600, the policy contained conditions avoiding the policy if the interest of the insured was not truly stated therein or other than unconditional and sole ownership, and the policy was issued to the insured "as interest may appear," and the Court held, quoting from the syllabus, that, "Where to the name of the insured, in a policy of fire insurance, are added the words, 'as interest may appear,' this indicates uncertainty, not only as to the extent, but as to the quality or character of the interest; the use of the phrase authorizes the insured, in case of loss, to show what his interest was; and the policy has the same effect as if the facts as to the interest as subsequently shown were inserted in the policy.

If, therefore, it thus appears that the insured, although not the owner, had an insurable interest, there is no breach of a condition of the policy forfeiting it in case the interest of the insured is not truly stated in the policy, or, if the interest is less than absolute ownership, and it is not so represented in the policy." It is said in 19 *Cyc.* 699: "If a policy is made payable to a designated person 'as his interest may appear,' there is no necessity for a specific statement as to the payee's interest, the policy amounting to a waiver of such a requirement. But this does not excuse a breach of condition as to

statements of title on the part of the insured, the payee not being regarded as such, nor the insurer as charged with notice of the nature of the payee's interest." *Agr. Ins. Co.* v. *Hamilton,* 82 Md. 88.

It is, therefore, clear upon authority that where the loss is made payable to a *third person* "as his interest may appear," the conditions of the policy referred to are not waived, but where the policy is issued to the insured "as his interest may appear," they are waived. Keeping in view the object of these provisions, it would seem equally clear upon reason that where the loss is made payable to the *assured* "as his interest may appear" that the interest referred to is the interest of the assured in the property, and that the intention of the parties to the contract was to protect that interest, whatever it might be. The assured cannot be treated as an assignee of the policy or appointee to receive the amount of loss. His interest in the amount of loss is derived from his interest in the property, and it would be a contradiction to say to the assured, your policy will be void if your interest is "other than unconditional and sole ownership" or is not truly stated in the policy, but the loss will be payable to you as your interest *may appear.* We fully concur in the view of the learned Court below that this provision of the rider would be meaningless unless it amounts to a waiver of the conditions referred to, and that it indicates an uncertainty in the minds of the parties to the contract as to the nature and extent of the insured's interest in the property, and that the agreement was that, in case of loss, the insured should receive the benefits of the policies according to his interest in the property. This construction affords ample protection to the insurer, and gives effect to a contract that would otherwise have been void at the time it was executed. *Hagan* v. *Scottish Ins. Co.,* 186 U. S. 423.

The fifth plea in the first case and the sixth plea in the second case (the two cases having been consolidated after the pleas, replications and rejoinders, etc., were filed), assert the proposition that the policies were void under the provision

requiring the interest of the assured to be truly stated in the policy, because it was not stated in the policy that the prop⸴ erty belonged to the insured and his wife, while in the eighth plea in the first case and the thirteenth plea in the second case the defendant relies on that provision and also the sole ownership clause, and charges that the policies were void because they were issued to the insured alone whereas the property was owned by the insured and his wife. By its seventh plea in the first case and its twelfth plea in the second case the defendant set up the defense that the policies were void, under the provision requiring the insured's interest to be stated therein, by reason of the undisclosed mortgage, to which the plaintiff replied that the existence of the mortgage "was not a material fact or circumstance to the risk of this insurance." The Court below overruled plaintiff's demurrers to the fifth, sixth, eighth and thirteenth pleas referred to, and sustained the demurrers to the replications to said sev⸴ enth and twelfth pleas, but as we have already decided that these conditions of the policies were waived by the riders making the loss payable to the "assured as interest may ap⸴ pear," it is not necessary to pass on the questions raised by the demurrers to these pleas and replications. Nor is it necessary to review the rulings of the Court below sustaining the demurrers to plaintiff's first replications to defendant's third and fourth pleas in each case. In those pleas the defendant relied on the failure of the plaintiff to furnish proofs of loss, and the plaintiff replied that the defendant had waived the provision requiring him to do so. The Court below sustained the demurrers on the ground that the replications were prolix and argumentative, and the plaintiff then filed additional or amended replications alleging waiver of proofs of loss, on which issues were joined. Where a demurrer to a plea or replication is sustained, and the pleader gets the full benefit of his defense or reply in an additional or amended plea or replication he is not prejudiced by the ruling on a demurrer even if the Court erred. *Moses* v. *Allen,* 91 Md. 42 ; *Fisher* v. *Diehl,* 94 Md. 112 ; *Bowman* v. *Little,* 101 Md. 273. What

we have just said applies also to the rulings on the demurrers to the first replications to the eighth and ninth pleas in the second case. These replications were held bad for duplicity, and the plaintiff then filed additional or amended replications setting up, in different forms, the same matters in reply to the pleas.

We find no error in the rulings in the first, second and third bills of exception. Section 8 of Article 50 of the Code of 1904 provides that, "Where two or more actions or obligations conditioned for the payment of any. money or two or more actions on the case arising *ex contractu* by and between the same plaintiff and the same defendant shall be brought at the same term, the Court in which such actions are pending shall, on motion of the defendant, order the said actions to be consolidated and when consolidated shall direct the clerk to tax the cost of but one action."

The plaintiff was asked by his counsel if he had ever read his policies, and the question being objected to, the witness was then asked: "Prior to the receipt of these letters of April 6th, 1908, state whether or not you knew that it was necessary for you to make out any further formal proofs of loss," and the second exception is to the refusal of the Court to permit the question to be answered. A party cannot profit by his own neglect, and, in the absence of fraud or mistake, the plaintiff was bound by the terms of his contract, whether he was familar with them or not. In *Hartford F. Ins. Co.* v. *Keating, supra,* the Court said: "The law assumes that parties understood the words they have used, and, therefore, unless there are potential reasons to the contrary, they are bound by the legitimate and usual meaning of the phrases they employ."·

The third exception is to the refusal of the Court to allow the plaintiff on re-examination to answer the following question, "Will you state whether or not, just before you went to see Mr. Rosenbush, you had received any notice from anybody that the Caledonian was going to refuse to pay these policies " We do not see the object of this question. The

plaintiff went to see Mr. Rosenbush just before he received
the letters from Mr. Bond, and long after the sixty days had
elapsed and after the alleged waiver of the proofs of loss, and
the fact that he then received the same information that he
received a few days later by the letters from Mr. Bond would
have been immaterial.   It was not necessary for him to ac
count for his going to see Mr. Rosenbush.   Whether he went
because he had been told that the defendant would not pay
the loss, or because he had not heard from Mr. Bond, was not
important.   After having waited, under the circumstances,
as long as he did without hearing from Mr. Bond, it was only
natural that he should have consulted an attorney, and the
fact that he did so after getting the information suggested in
the question, would not have reflected upon any of the issues
of the case.

The question as to the effect of the riders, making the loss
payable "to the assured as interest may appear," which we
have already determined, was raised by plaintiff's replica-
tions to pleas alleging forfeiture of the policies under the
sole ownership clause and the provisions requiring the inter-
est of the assured to be stated, etc.   The defendant demurred
to one of the replications in each case, which demurrers were
overruled; and filed a rejoinder to the other replications to
which the plaintiff demurred, and the Court sustained the
demurrer.   The plaintiff did not further reply to or join
issue on the replications, but the case was tried on issues
joined on other pleas, replications and rejoinders.   The ques-
tion having been determined by the Court below, by its rul-
ings on the demurrers to plaintiff's replications and to de-
fendant's rejoinder, and its ruling on defendant's first prayer,
in favor of the appellant, it is not strictly before us on this
appeal, but as it goes to the right of the plaintiff to recover
at all, and will arise on a retrial of the case, it would be use-
less to remand the case for a new trial if the contention of
the appellee is correct, and it is proper that it should be dis-
posed of.   1 *Poe's P. & P.,* 710; *Walter v. Wicomico Co.,*
35 Md. 395; *Boehm v. Baltimore,* 61 Md. 261; *Lycoming F.*

*Ins. Co.* v. *Langley,* 62 Md. 196; *McElroy* v. *John Hancock L. Ins. Co.,* 88 Md. 137.

The question presented by the defendant's demurrer to the replication to the fifth plea in the second case, and by its third prayer, which was also decided in favor of the appellant, while it only relates to the plaintiff's right to recover on one of the policies, will necessarily arise on a second tral of the case and ought to be disposed of also. The Court below held, and we think properly, that as the bulidings had not been completed at the time of the issuing of the policy and at the time of the fire, and were, therefore, unoccupied, the effect of the agreement annexed to the policy, giving permission to make completions, was to waive the provisions of the policy and warranty, requiring them to be occupied, until they were completed. It is not a question of the authority of the agent who saw the property and delivered the policy to waive any of its provisions, but of construction of the contract. The houses had not been completed and were not occupied at the date of the policy, and the agreement added to the policy, signed by an agent authorized to execute and issue it, gave the insured permission to complete them. Under such circumstances what is the proper construction of the contract? In view of the fact that they had not been completed what does the permission granted mean? The provision of the contract relied on by the appellee can only apply to houses that are completed and ready for occupancy, and it would be an empty statement to say to the insured you have permission to complete houses that are already completed. On the other hand, a policy containing such conditions, issued to cover buildings not completed, would be void (after the ten days vacancy allowed), in the absence of some agreement suspending the operation of the conditions until they had been completed. There is nothing in the terms of the permission granted limiting it to ten days, and the only reasonable construction of the contract, and one that will give effect to the provisions relied on and the permission granted. is that the conditions were not intended to apply until the

houses were completed and ready for occupancy. We said in
the opinion delivered by Judge Burke, March 2nd, 1910, in
the case of *Stevens* v. *Clarke, ante,* page 659 : "It is needless
to quote authorities to show that in the construction of a con-
tract the intention of the parties as it appears from the whole
agreement must be ascertained and given its full effect. The
rule of construction was stated, with great clearness, in *Nash*
v. *Towne,* 5 Wallace, 699, as follows: 'Courts, in the con-
struction of contracts, look to the language employed, the sub-
ject matter, and the surrounding circumstances. They are
never shut out from the same light which the parties enjoyed
when the contract was executed, and, in that view they are
entitled to place themselves in the same situation as the par-
ties who made the contract, so as to view the circumstances as
they viewed them, and so to judge of the meaning of the
words and of the correct application of the language to the
things described.' " The same rule was stated in *Dodge* v.
*Hughes Co,* 110 Md. 374. In 19 *Cyc.* 727, referring to
provisions avoiding the policy in case the property becomes
vacant, it is said: "Despite such general provisions, the real
contract may have been that the premises were insured as
vacant premises. In this event forfeiture clauses permitted
to remain in the policy form have no application." In the
case of *Luck* v. *Orient Ins. Co.,* 176 Pa. St, 638; 35 Atl. R.
247, the property was described as occupied by the insured
as a distillery, and the policy contained a provision that if
the subject of insurance was a manufacturing establishment,
the policy should be void "if it cease to be operated for more
than ten days." The distillery was not in operation at the
date of the policy or at the time of the fire, and had not been
for several years, and the company claimed that the policy
was void under the provision referred to, but the Court said:
"It was a distillery, and intended by the owner as such, but
not operated, and he did not know when it would be started.
He occupied then as he had for years before, and as he did
for months afterwards, although in the whole time he did not
distill a quart of whiskey. And, without misrepresentation

or concealment, this is just what the company, by its policy, insured,—an occupied, idle distillery,—no matter what the scope of the authorities of its agent. The agent did not frame the policy and insert the description. That is the company's instrument. Every contract must be interpreted in view of the subject of it, and the surroundings of the. parties at the date of it."

The question presented by the defendant's fourth prayer may not arise on the second trial, and will not be considered.

It follows from what we have said that there was error in the ruling in the fourth bill of exception, and in the granting of defendant's second prayer, and that because of these errors, the judgment of the Court below must be reversed and case remanded.

> *Judgment reversed with costs, and new trial awarded.*