FLESTER ET AL. *v.* THE OHIO CASUALTY
INSURANCE COMPANY

[No. 314, September Term, 1972.]

*Decided July 27, 1973.*

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Charles C. Bowie,* with whom were *Brault, Scott & Brault* on the brief, for appellants.

*Francis L. Young,* with whom were *Brown & Young* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

Whether appellant (Flester) was covered by automobile liability insurance for his 1956 Ford Thunderbird on May 10, 1970 is the ultimate question presented by this case. He appeals from a judgment of the Circuit Court for Prince George's County (McCullough, J.) declaring that such coverage was not provided by appellee (Ohio Casualty) for an accident occurring on that date.

In April 1969, Ohio Casualty issued to Flester a policy covering two automobiles, a 1962 Ford Fairlane and the Thunderbird. That policy was effective from April 21, 1969 to April 21, 1970. Having decided to relegate the Thunderbird to "classic car" status, Flester called his insurance agent (Marton) in August 1969 and requested that it be removed from the policy; and that it be replaced by a

1967 Mercury Cougar. This was accomplished by a written endorsement to the policy effective on August 7, 1969.[1]

On August 10, 1969 — just three days after it had been added to the policy — the Cougar was heavily damaged in an accident. As a consequence, Flester found it necessary to reactivate the Thunderbird. These developments were reported by Flester to Marton on August 11. On that same day, Marton mailed an accident report to the insurer, and also furnished a copy to Flester. The final sentence in that report states: *"While the Cougar is being repaired,* this agency is binding coverage on Mr. Flester's 56 Ford Hdtop [the Thunderbird] which was just removed from policy." (emphasis added). Marton says Flester informed him that he planned to have the Cougar repaired and returned to use. On that basis, Marton states, it was agreed that the agency "would temporarily bind coverage." on the "Thunderbird during the period of repairs on the '67 Cougar."

Flester's version concerning that part of the conversation differs slightly, as shown by the following excerpts from his testimony:

"Q What did you tell Mr. Marton as to that? A He asked me if I thought the car would be repaired to that point. I told him then I didn't think so; that I thought the car was a total loss.

"Q And was there any conversation concerning the 1956 Thunderbird? A He said, yes, he said, I could drive that car and the company would bind coverage on it *until the car was repaired or replaced.*

\* \* \*

"Q Did you notify the agency that your 1967 Mercury Cougar, which was involved in the

---

1. Although we have referred to Marton, in the vernacular, as Flester's "insurance agent," it is undisputed that Marton's father, through whom the insurance here involved was placed, was — at all times material to this case — an agent of Ohio Casualty; and, as such, was authorized to sell insurance and give binders, oral or written, for automobile coverage.

accident of August 1969, was repaired or not?
A No, because it never was repaired.

* * *

"Q Did you tell Mr. Marton that it wasn't to be repaired or something along that line? A I don't ever recall telling them that it was not, *no.*" (emphasis added).

Shortly after the accident was reported to Ohio Casualty, it paid to Flester the sum of $2115 as the fair market value of the Cougar immediately prior to the accident. He then elected to repurchase the car for its salvage value which was fixed at $170. As the cost of repairs would have exceeded the $2115, the car was declared a total loss.

Marton testified he learned from Flester in late August that he had decided to replace the Cougar rather than repair it. As he recalls, Flester had either located another 1967 Cougar or was searching about for one. Flester indicated that these arrangements would be completed within a week of that discussion. Nothing further transpired, however, and in October — Marton puts it between the 9th and 15th — the latter called Flester, who then led him to believe that he was still negotiating for another 1967 Cougar. The only remaining personal contact Marton had with Flester — prior to the May 1970 accident — was in December 1969. On that occasion, Marton visited the automobile parts establishment at which Flester was employed to make some purchases. Other than that the replacement had not yet been acquired, nothing further was said. Marton, in any event, is quite emphatic in stating that after Flester revealed his plan to replace rather than repair the Cougar, the binder was only intended to cover the Thunderbird for the period of time required to purchase another Cougar — ten days to two weeks.

Flester says — and this is borne out by Marton's records — that at no time between August and the May 10, 1970 accident was he told by Marton or anyone on behalf of Ohio Casualty that the Thunderbird was not covered, or that the

548

binder was withdrawn. In October he received a premium notice which he paid.[2] He also recalls that they did have one more conversation subsequent to August, in which Flester said he was still looking for a Cougar, and Marton told him to report when he succeeded. On the other hand, Flester used the Thunderbird continuously through the remainder of 1969 and early 1970 — until the second accident — apparently without the knowledge of Marton or Ohio Casualty.

In early April of 1970, a renewal policy issued by Ohio Casualty — effective for one year beginning April 21 — was forwarded by Marton to Flester. That policy listed as the two insured vehicles the Ford Fairlane and the same Cougar which had been damaged. The Thunderbird was not mentioned. Flester says that he never examined that policy and, therefore, did not notice what cars were listed in the typewritten schedule. For that matter, neither did Marton. Flester says his sole concern was the premium which he promptly paid. This indifference on Flester's part was not unprecedented; he also testified that he had never read the accident report which specified that Marton was binding the Thunderbird while the Cougar was "being repaired."

On May 10, 1970, while Flester was operating the Thunderbird with one William D. Maske (Maske) riding as a passenger, it was involved in an accident. As a result, Maske sustained personal injuries and brought suit against Flester. Whether the latter was covered by Ohio Casualty for that claim, as we noted at the outset, is the ultimate question posed by this case. If the accident had no other positive consequences, it seems to have awakened Flester to the contents of his policy. Marton says that when Flester reported the accident on May 13, the latter also requested that the Thunderbird be added to the policy and that thé Cougar be eliminated. Curiously enough, this was accomplished by a written endorsement dated May 18, effective on May 13.

2. All premium notices directed to Flester, and paid by him, were for the automobiles described in applicable policies or written endorsements thereto.

To further add to the strange sequence of events, on May 25, 1970 Ohio Casualty filed with the then Department of Motor Vehicles an SR-21 form signifying that it had insured the Thunderbird for the May 1970 accident. This action was rescinded sometime later by Ohio Casualty, which claimed that the form had been filed inadvertently. A fitting climax to this unusual chronology was Flester's purchase in June 1970 of another 1967 Cougar, which was then added by written endorsement to the existing policy.

At the conclusion of the trial, Judge McCullough declared that the Thunderbird was not covered by Ohio Casualty for the May 10, 1970 accident; and therefore it was neither required to defend the action brought by Maske against Flester, nor liable for any judgment which might be rendered in that suit. In doing so, he concluded that there was an oral binder issued by Ohio Casualty's agent with the intent to cover the Thunderbird while the Cougar was being repaired or until it was replaced; that the binder was effective until the issuance of the April 1970 policy, but not thereafter. We think Judge McCullough decided the case correctly, and we shall affirm the judgment.

In urging reversal, Flester contends: (1) That the trial judge erred in ruling that the oral binder did not cover the May 10, 1970 accident; and, in any event, (2) that the court should have reformed the April 1970 policy to conform with the oral binder.

(1)

Flester advances his initial contention in two parts. First, he argues that the parties entered into an oral contract on August 11, 1969 which was new and separate from any written policy, and had its own termination date; and that this contract was in effect on the day of the May 1970 accident. In short, he maintains that an oral contract of insurance was entered into which was to cover the Thunderbird until the damaged Cougar was replaced by another; and since this did not occur until June 1970, the oral contract was operative until the latter date. Hence, he argues, Ohio Casualty's action in denying coverage for the

Thunderbird amounted to a cancellation of insurance without the prior notice required by Maryland Code (1957, 1968 Repl. Vol.) Art. 48A, § 240A and Code (1957, 1967 Repl. Vol.) Art. 66½, § 142, which were then in effect.

The second facet to his principal contention is that the court below erred in ruling that the policy issued in April 1970 "was the written policy contemplated by the oral binder"; and that the binder therefore merged into that written policy. In effect, he contends that since the written policy issued in April 1970 omitted any reference to the Thunderbird, it was not "the policy with respect to which [the binder] was given." Since, for this reason, there was no merger of the binder into the 1970 written policy, he claims that it survived issuance of the latter, and covered the accident.

We think that the two issues, as framed by Flester, overlap to some extent; and we shall consider them together as part of the larger question, *i.e.*, whether the oral binder afforded coverage to Flester for the May 1970 accident. The parties and the trial judge seem to have been in agreement that the conversation of August 11, 1969, between Flester and Marton, resulted in a commitment on behalf of Ohio Casualty which, in the parlance of the insurance world, is called a binder. The term has been frequently defined by the authorities, and there is general accord over its meaning. In 44 C.J.S., *Insurance*, § 49, it is stated:

> "The term 'binder' has a well-known significance in the parlance of insurance contracts, and a binder or a binding slip is merely a written memorandum of the most important terms of a preliminary contract of insurance intended to give temporary protection pending the investigation of the risk of insurer, or *until the issuance of a formal policy*; a contract of insurance in praesenti, *temporary in its nature*, intended to take the place of an ordinary policy until one can be issued. . . ." (emphasis added).

*See* 43 Am. Jur. 2d, *Insurance*,. § 216; 12 Appleman,

*Insurance Law and Practice*, § 7221 (1943); 1 *Couch on Insurance 2d*, § 14:26 (1959).

Binders have long been recognized in Maryland as a present temporary contract of insurance between the parties, *Simpson v. Prudential Ins. Co.*, 227 Md. 393, 177 A. 2d 417 (1962); *Mutual Fire Insurance Co. of Montgomery County v. Goldstein*, 119 Md. 83, 86 A. 35 (1912).[3] And, while often evidenced by a binding slip or memorandum, they may exist orally, *Mutual Fire Insurance Co. of Montgomery County v. Goldstein, supra; Insurance Co. v. Ryland*, 69 Md. 437, 16 A. 109 (1888); 1 *Couch on Insurance 2d*, § 14:32 (1959). These principles have been codified as Code (1957, 1972 Repl. Vol.) Art. 48A, § 379, which provides:

"Binders and temporary insurance.

"(a) Binders or other contracts for temporary insurance *may be made orally or in writing*, and shall be deemed to include all the usual terms of *the policy as to which the binder was given* together with such applicable endorsements as are designated in the binder, except as superseded by the clear and express terms of the binder.

"(b) *No binder shall be valid beyond the issuance of the policy with respect to which it was given.*

"(c) This section shall not apply to life or health insurances." (emphasis added).

While the definition of an insurance binder appears to be reasonably well settled, it is the unique factual situation presented here which tends to complicate the issues. What may be viewed as the ordinary use of a binder in the context of automobile insurance is described in 7 Am. Jur. 2d, *Automobile Insurance*, § 3:

"Frequently, for the purpose of convenience or expediency so that the owner of an automobile may operate it before obtaining the formal policy of

---

**3.** For a discussion of binders in general usage, see Note, Enforceability of Temporary Binders Issued by Life Insurance Companies, 22 Md. L. Rev. 230 (1962).

insurance, an oral contract of insurance is entered into, or a binding slip, also called a 'binder,' is issued, for the purpose of insuring the vehicle *until the actual issuance and delivery of the policy* to the insured. As in the case of other types of insurance, it is settled generally that such a contract is valid and binds the insurer *until the issuance and delivery of the policy agreed upon*." (emphasis added).

Clearly, what occurred in this case differs from the commonly-accepted situation outlined above. The underlying thrust of Flester's appeal is the contention that the parties — on August 11, 1969 — entered into a separate oral contract, not one which was to terminate upon the issuance of a written policy, but rather upon the replacement of a vehicle which was, itself, not covered by the oral agreement.

Although the factual situation here poses no problem concerning the commencement of coverage, since binders form a present contract of insurance, *Simpson v. Prudential Ins. Co.* and *Mutual Fire Insurance Co. of Montgomery County v. Goldstein*, both *supra*, and become effective immediately, 12 Appleman, *Insurance Law and Practice*, § 7221 (1943), ascertainment of the duration here is another matter.

By its very definition, a binder is intended to be temporary; and some states have even enacted statutes restricting the length of time during which a binder may remain in force, *see Turner v. Worth Insurance Company*, 106 Ariz. 132, 472 P. 2d 1 (1970) (90 days); *Foundation Reserve Insurance Co. v. Kennedy*, 79 N. M. 382, 444 P. 2d 293 (1968) (15 days); *Citizens Casualty Co. of New York v. Hackett*, 17 Utah 2d. 304, 410 P. 2d 767 (1966) (150 days); *Eastern Shore of Virginia Fire Ins. Co. v. Kellam*, 159 Va. 93, 165 S. E. 637 (1932) (30 days); *Rowell v. Georgia Casualty & Surety Co.*, 109 Ga. App. 631, 136 S.E.2d 917 (1964) (90 days). No such statutory period exists in Maryland; nor did the binder in question here specify a termination date. In such

situations elsewhere, the binder's coverage has been held to extend until issuance of the formal policy, *Hurd v. Maine Mut. Fire Ins. Co.*, 139 Me. 103, 27 A. 2d 918, 923 (1942); *Reishus v. Implement Dealers Mutual Insurance Co.*, 118 N.W.2d 673 (N.D. 1962); *Carew, Shaw & Bernasconi v. General Casualty Co.*, 189 Wash. 329, 65 P. 2d 689 (1937), or until the passage of a reasonable time to investigate the risk and communicate a rejection to the applicant, *Hurd v. Maine Mut. Fire Ins. Co.* and *Eastern Shore of Virginia Fire Ins. Co. v. Kellam*, both *supra; Epstein v. Great American Insurance Co.*, 54 Tenn. App. 447, 392 S.W.2d 331 (1965); 44 C.J.S., *Insurance*, § 230; 43 Am. Jur. 2d, *Insurance*, § 218. In 9 *Couch on Insurance 2d*, § 39:207 (1962), it is stated:

> "Since parol contracts of insurance *usually cover the time necessarily elapsing between the placing of the insurance and the issuing of the policy*, the duration is ordinarily for such period of time as is a reasonable one under the circumstances for the issuance of a formal policy. The preliminary or temporary contract is therefore effective *until either superseded by a policy*, when issued, or terminated by a rejection of the application, and notice thereof to the insured, or by the expiration of the time specified in the preliminary or temporary contract, or of a reasonable time, when none is specified." (emphasis added).

As we have stressed, the outcome of the August 11 discussion between Flester and Marton does not reflect the concept of a typical automobile insurance binder, *i.e.*, temporary insurance designed to afford protection for a relatively brief time span. This period usually covers the interval between the application for the insurance and the issuance of a formal policy. It is in this context that binders are normally regarded as expiring "upon the issuance of the policy." While the agreement in this case may not fit into one of the conventional molds, it is no less a binder. The thread that runs through the various definitions of this term is the *temporary* coverage that is provided by the insurer.

Here, the issuance of a new policy covering the Thunderbird was never intended; the binder was only given "with respect to" the policy already in existence. In other words, the binder was intended by the parties to be effective, as Judge McCullough said, during "a period of time when either the Cougar would have been replaced or repaired." With the passage of the relatively short time period intended for either eventuality, however, and without any word from Flester, the binder's existence terminated upon the expiration of the policy which it had *temporarily* modified. At that point, it was "superseded" by the formal policy issued on April 21, 1970. That Flester failed to note what automobiles were listed in that policy does not defeat its operativeness, and he is bound by its description of the insured vehicles, *Bitting v. Home Ins. Co.*, 161 Md. 56, 64, 155 A. 329 (1931); *Miller v. Home Ins. Co. of N. Y.*, 127 Md. 140, 147, 96 A. 267 (1915); *Bakhaus v. Caledonian Ins. Co.*, 112 Md. 676, 695, 77 A. 310 (1910).

Under the view we adopt here, there could not have been an independent insurance contract covering the Thunderbird, to expire on some future date when the *Cougar* was ultimately replaced. That argument is contrary to the concept of temporary coverage inherent in the binder, and would, in effect, establish an oral policy of indefinite duration. As Judge McCullough so aptly observed, under this view "the binder goes on and on and on, it would, in effect, still be in force today."

There being no separate contract insuring the Thunderbird, the argument that there was a cancellation or refusal to renew, notice of which was required by either Art. 48A, § 240A or former Art. 66½, § 142, is lacking in merit. There was no cancellation or refusal to renew on April 21, 1970. On the contrary, there was a renewal of the 1969 policy, with precisely those vehicles described as had been covered immediately before the temporary binder was given.

The conclusion that the binder covering the Thunderbird was merely a temporary modification of the policy issued in April 1969 is similarly dispositive of Flester's subsidiary contention: That the trial judge erred in holding that Ohio

Casualty's issuance of the policy in April 1970 effected a merger of the binder.

(2)

Flester insists that he should prevail, in any event, by a reformation of the insurance policy; that it may "conform with the oral contract," and thus reflect the intention of the parties.

In so contending, Flester assumes a formidable task, for reformation is not granted lightly. As Judge Prescott said for the Court in *Moyer v. Title Guarantee Co.*, 227 Md. 499, 177 A. 2d 714 (1962):

> "The request for the reformation of a written instrument is one for unusual relief, and when granted, it differs from rescission, cancellation or annulment of the document. Unlike these, the instrument remains in force and effect, but in a modified, or changed form; hence, before granting the high remedy of reformation, the proof must not only establish that the written agreement was not the agreement intended by the parties, but also what was the agreement contemplated by them at the time it was executed. . . . Before performing the difficult and delicate task of reforming an agreement after the parties have solemnized it by reducing it to writing and executing the same, *this Court has consistently required proof of the highest order.* In *Keedy v. Nally,* 63 Md. 311, 316 [1885], Judge Alvey, for the Court, said that the plaintiff, 'must not only show clearly and beyond doubt that there has been a mistake, but he must also be able to show with equal clearness and certainty the *exact* and *precise* form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties.' . . . Again in *White v. Shaffer,* 130 Md. 351, 360, 99 A. 66 [1917], it was stated: ' "Not only must a mutual mistake be shown,

.but the precise agreement which the parties
intended but failed to express must be proven
beyond a reasonable doubt. *Second Nat'l Bank v.
Wrightson*, 63 Md. 81 [1885]; *Bouldin [Boulden] v.
Wood*, 96 Md. 336 [332] (53 A. 911) [1903]. And *the
evidence required for this purpose must be of the
strongest character* and the proof must be
convincing." ' The Court, in *Brockmeyer v. Norris*,
177 Md. 466, 473, 10 A. 2d 326 [1940], quoted, with
approval, this passage from Pomeroy: ' "Courts of
equity do not grant the high remedy of reformation
upon a probability, nor even upon a mere
preponderance of evidence, but *only upon a
certainty of the error."* ' See also *Hubble v.
Somerville*, 187 Md. 418, 422, 50 A. 2d 565 [1947];
*Urquhart v. Alexander*, 218 Md. 405, 411, 147 A. 2d
213 [1958]." 227 Md. at 504 (emphasis added).

More recently, we quoted *Moyer* with approval in *Housing
Equity Corp. v. Joyce*, 265 Md. 570, 580-81, 290 A. 2d 769
(1972).

From these and other authorities emerges the
fundamental principle that although courts exercising
equity powers may reform an instrument to conform it to
the intention of the parties, *Mattingly v. Houston*, 235 Md.
54, 200 A. 2d 160 (1964); *Painter v. Delea, Att'y*, 229 Md. 558,
184 A. 2d 913 (1962), a written document will be reformed
when and only when there is a mutual mistake of fact, or a
.mistake is made by one of the parties accompanied by fraud,
duress or other inequitable conduct practiced on the person
making the mistake by another party, *Housing Equity Corp.
v. Joyce; Mattingly v. Houston; Painter v. Delea, Att'y;
Moyer v. Title Guarantee Co.*, all *supra*.

Since there is. no claim of fraud, duress or other
inequitable conduct made here, we consider only whether
there was a mutual mistake between the parties that
resulted in the April 1970 contract as written. "·'In other
words, it must be *conclusively* established that both parties
understood the contract as it is alleged it ought to have been

expressed, and as in fact it was, but for the mistake alleged in reducing it to writing.' " *Automobile Ins. Co. v. Shapiro*, 151 Md. 383, 387, 135 A. 163 (1926) (emphasis added).

Exposed to the stringent requirements which must be met if the "high remedy of reformation" is to be granted, Flester's claim of mutual mistake simply does not withstand scrutiny. Even if we assume *arguendo* that *he* intended to have the Thunderbird covered by the April 1970 policy — and the proof in this regard is tenuous at best — there would be merely a unilateral mistake. The subsequent filing of the SR-21 form — which was later withdrawn — is hardly sufficient to establish that Ohio Casualty intended to cover the Thunderbird when it *issued* the policy. Nor is the heavy burden met by the evidence that the damaged Cougar was listed as an insured vehicle. Flester concedes that he had no contact with either Marton or Ohio Casualty after December. And, while Ohio Casualty was aware of the heavy damage sustained by the Cougar, it was never told whether that car had been disposed of, replaced or repaired. From such meager evidence, a mistaken omission of the *Thunderbird* cannot be found. In sum, the claim of mutual mistake, on which Flester rests his case for reformation, is unsupported by the high degree of proof required in such circumstances.

Upon this record, dominated as it is by a novel succession of events, Judge McCullough ruled correctly in declaring that the 1956 Ford Thunderbird was not covered in the accident by the insurance policy issued on April 21, 1970; and in refusing to reform that contract.

*Judgment affirmed; appellants
to pay costs.*