LEA & ADCOCK v. ATLANTIC INSURANCE COMPANY.

(Filed 31 March, 1915.)

1. **Insurance, Fire—Parol Contract—"Binder"—Written Evidence.**

In the absence of statutory regulation, a parol contract of fire insurance is valid, and a written memorandum thereof, called a binder, is also competent evidence of the agreement entered into between the parties.

**2. Same—Validity of Contract.**

Our statute, by establishing a standard form of fire insurance, does not prevent the binding effect of a parol agreement of insurance, looking to the delivery of the policy according to the form prescribed and evidenced by a written memorandum thereof, called a binder; and when such is shown to have been made in a manner to bind the company, it is in force from that time, and thereafter the insured is responsible for the loss in accordance with the terms of the statutory form of policy.

**3. Insurance, Fire — Parol Agreement — "Binder" — Contracts—Evidence— Trials.**

Evidence that the insured requested fire insurance in a certain sum on tobacco he had in a certain warehouse from the local agent of the insurer, who agreed thereto, gave a written memorandum or "binder" to that effect, contemplating, according to the custom between the parties, the subsequent delivery of the statutory form of policy, and payment of the premium, is sufficient upon the question of whether a valid contract of insurance had been entered into, under the circumstances of this case.

**4. Insurance, Fire—Parol Agreement—Principal and Agent—Agent's Authority—Evidence—Trials.**

Where the evidence tends to show that an insurance company customarily sends to its local agents batches of its policies, properly signed by its officials and wanting only the signatures of the local agents to give them validity; that these agents were accustomed to bind the company by parol agreement to insure, giving the insured a written memorandum or "binder" thereof, followed by the delivery of the statutory forms of policies, which were received by the home office without question, it is sufficient upon whether the acts of the agents therein were authorized by the company and binding upon it.

**5. Insurance, Fire — Principal and Agent — Insured—Private Advantage— Banks and Banking.**

Where the cashier of a bank also acts as agent of a fire insurance company, and charges the premiums for policies against the insured's account at the bank, and then remits them to the insurer, it does not come within the condemnation of *Folb v. Insurance Co.*, 133 N. C., 180, which holds that the insured cannot pay his premiums by satisfying a private debt due him by the agent of the company.

BROWN, J., took no part in the decision of this case.

APPEAL by defendant from *Whedbee, J.,* at October Term, 1914, of WAKE.

Action to recover upon two contracts of insurance.

The record discloses that the plaintiffs, Lea & Adcock, were in December, 1913, and January, 1914, doing a leaf tobacco business at Fuquay Springs, N. C.; that they owned a large quantity of leaf and scrap tobacco then in the Banner Warehouse; that on 17 December, 1913, they applied to Howard & Aiken, agents of the defendants, for $3,000 of insurance on said stock of tobacco, and that on 9 January, 1914, plaintiffs

likewise applied to said agents for $2,500 additional insurance on said stock of tobacco in the Banner Warehouse. That when application was made to the said agents for the said insurance the said agents agreed with the plaintiff that they would insure said stock of tobacco, and that they did execute the two paper-writings, spoken of as "binders," in words and figures as follows, towit:

$3,000 on stock of tob. Lea & Adcock.    Atlantic, Raleigh, 12 mos. 12/17/13.                              HOWARD & AIKEN, *Agts.*

$2,500 on Lea & Adcock stock tob. 12 mos. Atlantic, Raleigh, 1/9/14.                                      HOWARD & AIKEN, *Agts.*

On 26 January, 1914, and before policies of insurance had been issued and delivered to the plaintiffs, a fire broke out in a neighboring warehouse, called the Farmers Warehouse, which fire spread to the Banner Warehouse and consumed it, together with the stock of tobacco therein. The next day after the fire the plaintiffs notified the defendants of the fire and of their loss, and demanded payment for the same. The defendant declined and refused to make payment.

The premiums upon the policies referred to in the binders had not been actually paid by the plaintiffs at the time of the fire, but credit had been extended to the plaintiffs, the amounts due thereon had been charged up by the defendants' agents, Howard & Aiken, against the plaintiffs, Lea & Adcock. Mr. Howard, of Howard & Aiken, was cashier of the Fuquay Bank, and all premiums of Lea & Adcock, by a previous agreement, were charged. "A debit slip was returned the same as checks and were cashed and returned and charged to Lea & Adcock's account." This arrangement had been in force between the parties for several years. In September, 1913, the plaintiffs had taken out other insurance in the defendant company and the premium amounted to $33. The slip which was charged up by Howard, the cashier, against Lea & Adcock on the September policy was offered in evidence as tending to show the said arrangement. It was for $33. Mr. Chamberlain, who was in charge of the plaintiffs' business, testified that all of the plaintiffs' insurance was under that arrangement, which arrangement had been in force for many years.

Both Howard and Aiken, agents of the defendant, were examined as witnesses. Mr. Howard, who is cashier of the bank, confirms the statement that the binders were issued by him as agent for the defendant, and "that a slip in each case would be placed in the bank against Lea & Adcock for the premium and that this would be a debit ticket and would be returned and canceled as a voucher." He says that this agreement was effective when the binders were issued, and that when credit was

extended to Lea & Adcock, Howard & Aiken became responsible to the company with respect to remitting to them; that he looked after the financial end of the matter, but that Mr. Aiken, his partner, usually filled out the policies for tobacco. It appears, in December, that Mr. Aiken, who usually did this work, was absent, and that Howard did not have the time to fill out the policy until the fire occurred. Mr. Howard explains about the blank policies. About fifty of these blank policies were in his possession as agent of the defendant, all signed up by the president and secretary of the defendant. He states that they were in the usual form, signed by G. H. Dortch, secretary, and by Charles E. Johnson, president, and that they were sent to his firm from the Raleigh office; that he had them in his possession when he gave both binders; *that his firm delivered the policies to the insured and did not have to send to Raleigh for the policies.* He states that that is the only way that Howard & Aiken ever did business for the defendant, and that it was the usual and customary way of issuing policies; that they would report to the company that they had issued a policy, but would never report that they had given a binder, because the policy was to follow soon afterwards. That during the life of their agency Howard & Aiken issued *one hundred and six* policies for the defendants in this way, and that the premiums during their five months agency amounted to over $1,000 net to the defendant. That it was not customary to notify the company of the issuing of any memorandum slip, and that they did not make a daily report of any binding slips. He further states that the policy issued by the defendant in September, 1913, was deposited in the Bank of Fuquay for safe keeping.

Mr. Aiken, the partner of Mr. Howard, says that the memorandum slip for the policy dated 18 September was not reported to the defendant; "we never reported a binder; we reported only the policy." He says that the tobacco companies had printed forms of binders, which was a kind of preliminary insurance to take effect before the policy could be written, and that binders issued upon the tobacco of these companies were never reported to their general agents. This witness further states that on one occasion he asked Mr. Busbee, the general agent of the defendant, for a printed form of binder, as it was not always convenient to write out the policy immediately. Mr. Busbee stated that he would send one, but never did. The defendant required us to make daily reports when we issued a policy, but not as to binders. Blank forms of policies duly signed up by an officer of the defendant, identified by this witness, being fifty in number, and a large lot of stationery, which was furnished to the agents, including books, etc., were identified by this witness and offered in evidence.

A jury trial was waived, and by consent his Honor found the facts in the form of answers to issues as follows:

1. Did the defendant through its duly authorized agents, Howard & Aiken, on 17 December, 1913, insure the plaintiffs' stock of tobacco in the Banner Warehouse at Fuquay Springs in the sum of $3,000 for a period of twelve months? Answer: "Yes."

2. Did the defendant through its duly authorized agents, Howard & Aiken, on 9 January, 1914, insure the plaintiffs' stock of tobacco in the Banner Warehouse at Fuquay Springs in the sum of $2,500 for a period of twelve months? Answer: "Yes."

3. If so, was said insurance of $5,500 in force on 26 January, 1914? Answer: "Yes."

4. Was said stock of tobacco totally destroyed by fire on 26 January, 1914? Answer: "Yes."

5. In what sum is defendant indebted to plaintiffs on account of said insurance? Answer: "$5,500, with 6 per cent interest from 21 May, 1914 (sixty days after proof of loss).

6. What was the value of the tobacco of the plaintiffs destroyed by fire at date of fire, 26 January, 1914? Answer: "$11,184.54." 

Judgment was entered in favor of the plaintiffs, and the defendant excepted and appealed.

*Winston & Biggs for plaintiffs.*
*A. B. Andrews, Jr., and James H. Pou for defendant.*

ALLEN, J. There are several exceptions to the admission of evidence, but all of them were taken to preserve and present the contentions of the defendant, (1) that a standard form of policy of insurance having been adopted by statute, neither a parol contract of insurance nor a written memorandum of the contract, known as a binder, is valid; (2) that there is no evidence of a parol contract and no evidence of a delivery of the binder; (3) that there is no evidence that Howard & Aiken, agents of the defendant, had authority to make a contract of insurance; and if we are against the defendant on these positions, the evidence offered to prove these facts was competent.

(1) Is a parol contract of insurance or a memorandum of the contract, called a binder, valid, although a standard form of policy has been adopted by statute?

In the absence of a statutory prohibition, the great weight of authority is in favor of the validity of a parol contract of insurance. 19 Cyc., 600; Vance on Insurance, 155 Com.; *Marine Ins. Co. v. The Union Fire Ins. Co.,* 19 How., 318; *Ins. Co. v. Coit,* 85 U. S., 567; *Phœnix Ins. Co. v. Ryland,* 1 L. R. A., 549 (Md.); *Horne Ins. Co. v. Adler,* 71 Ala., 524;

*Fire Ins. Co. v. Wilcox,* 57 Ill., 182; *Campbell v. Ins. Co.,* 73 Wis., 108; *Walker v. Ins. Co.,* 56 Me., 378; *Floars v. Ins. Co.,* 144 N. C., 235.

In the last case this Court said: "It seems to be well established that in the absence of some statutory inhibition, an oral contract of insurance, or to insure, will be upheld if otherwise binding, except, as suggested by one author, in the case of guaranty insurance," and this position is fully sustained by the other authorities cited.

The memorandum of the agreement or binder is also well recognized and established as a valid contract of insurance. Vance on Insurance, 160; 19 Cyc., 395; *Lipman v. Ins. Co.,* 121 N. Y., 457; *Kerr v. Ins. Co.,* 124 F., 835; 1 Cooley Ins. Briefs, 535; 16 A. and E. Enc., 851; *Karelson v. Ins. Co.,* 122 N. Y., 545; *Putman v. Ins. Co.,* 123 Mass., 324; *Gardner v. Ins. Co.,* 163 N. C., 367.

In Vance on Insurance, 160, the author says: "The binding slip is merely a written memorandum of the most important terms of a preliminary contract of insurance, intended to give temporary protection pending the investigation of the risk by the insurer, or until the issue of a formal policy," and this was cited with approval in *Gardner v. Ins. Co., supra,* as was also *Lipman v. Ins. Co.,* 121 N. Y., 454, which holds a binder to be a valid contract of insurance.

In 19 Cyc., 595, the custom of issuing binders is referred to and their legal effect is stated as follows: "It is usual, however, to issue to the person contracting for insurance some sort of a receipt or memorandum, which is sometimes called a binding slip, evidencing the making of the contract, although not specifying its terms and conditions. Such binding slip or memorandum is evidence of a present contract of insurance between the parties, and the insurance takes effect and is in force from the time the binding receipt or memorandum is delivered to the person contracting for the insurance."

Also, *Chief Justice Parker* says in *Hicks v. Ins. Co.,* 162 N. Y., 284: "It is usual for the company to issue a policy of insurance evidencing the contract between the parties, but the policy accomplishes nothing more than that; for when the contract is entered into between the agent and the owner, whether the binder be verbal or in writing, it includes within it the standard form of policies, and the contract is a completed one. So that all the plaintiff had to do in order to recover, aside from showing a loss by fire and compliance on her part with the condition of the contract, was to prove the making of the contract. This was accomplished by proving the conversation between her assignor and the agent, for the conversation disclosed the sum for which the property was to be insured, the amount of premium, and the period of the insurance, and the statute provided for all of the other conditions of the contract of insurance."

If, therefore, a parol contract, or one evidenced by a binder, would be legal and enforcible in the absence of statutory regulation, does the fact that a standard form of policy has been adopted render them invalid?

We think not. As we said in *Blount v. Fraternal Assn.*, 163 N. C., 170: "The statute does not purport to deal with the validity of the contract of insurance, but with the insurance company," and it was never intended to furnish the opportunity or temptation to a company to change the form of the contract and thereby escape liability.

In *Armstrong v. Ins. Co.*, 95 Mich., 139, which is approved in *Gazzam v. Ins. Co.*, 155 N. C., 337, the Court having under consideration a statutory form of policy, said of the effect of deviating from its terms: "In construing this statute, we must consider the purpose which the Legislature had in view. It was not to subserve any public policy. Contracts of insurance, so far as the public are concerned, stand upon no different basis than other contracts. The object was to protect policy-holders and to provide a policy fair to the insured and the insurer, and avoid litigation. It was undoubtedly well known to the Legislature that policy-holders do not usually examine and scrutinize their policies with the same care that they do other contracts which they make, involving their ordinary business transactions. The statute imposes a penalty upon an insurance company for issuing such a policy, but imposes none upon the insured. In using the word 'void' the Legislature certainly did not contemplate that an insurance company might insert a clause not provided for in the standard policy, receive premiums year after year upon it, and, when loss occurs, say to the insured, 'Your policy is void, because we inserted a clause in it contrary to the law of Michigan.' Such a result would be a reproach upon the Legislature and the law. The law, so construed, instead of operating to protect the insured, would afford the surest means to oppress and defraud them, and thus defeat the very object the Legislature had in view. In 16 A. and E., 851, the author says: 'This preliminary contract is of the greatest importance, for if the applicant could not be made secure until all the formal documents were executed and delivered, the beneficial effect of the insurance system would be greatly impaired; and a clause in the State insurance law or in the charter of an insurance company providing that policies shall be executed in a certain manner does not affect the power of the insurer to make these preliminary arrangements. Such a contract remains in force until it is superseded by the issuance of a regular policy, or until the risk is rejected by the insurer, and the insurer is liable for any loss in the meanwhile."

Also, in *Floars v. Ins. Co.*, 144 N. C., 235, Vance on Insurance and *Hicks v. Ins. Co.*, 162 N. Y., 284, are cited in support of the proposition

"that the enactment of a statute which establishes a standard form for a policy, the statute being only affirmative in its terms, will not invalidate an oral contract," and further, that "the law will read into the contract the standard policy as fixed by the statute."

(2) We are also of opinion that there is evidence of a parol contract to insure and of a delivery of the binder.

Mr. E. H. Howard, one of the agents of the defendant, says with reference to the parol contract: "I agreed to insure that tobacco for them," and with reference to the binders, "That agreement was effective when the binders were issued."

S. W. Chamberlain, who was a bookkeeper of the plaintiffs and had charge of taking out insurance for them, testified: "I saw Mr. Howard and asked him about $3,000 insurance. I told him that I wanted it on leaf tobacco in the Banner Warehouse. It was then known as the Banner Warehouse, Lea & Adcock stock of tobacco. He agreed to issue the insurance for me. He gave me a binder at that time. On 9 January I applied to Mr. Howard and told him I wanted $2,500 additional insurance on leaf tobacco or tobacco of Lea & Adcock in the Banner Warehouse. He said all right, and gave me the binder."

If this evidence is believed, there was an oral agreement to insure and a delivery of the binder to Mr. Chamberlain, the bookkeeper and agent of the plaintiffs.

This seems to be recognized in the brief of appellant, in which, referring to the last binder, it is said: "This slip, like the other, was delivered to the witness Chamberlain, who retained possession of the same."

(3) The evidence as to the authority of Howard & Aiken, agents of the defendant, to issue the policies of insurance is ample.

It was in evidence that it was the custom of the defendant to send its policies of insurance in blank to the agents, and that they were filled up and signed by them; that these policies were ready for delivery without being sent back to the principal office, and that about one hundred policies had been issued by these agents in that way which were accepted by the defendant, and that about fifty of them were in the hands of the agent at the time of the trial.

The witness Howard, one of the agents, testified: "I see the blank forms of policies now shown me, purporting to be the Atlantic Fire Insurance Company of Raleigh, N. C., in the usual form, signed by G. H. Dortch, secretary, and Charles E. Johnson, president, countersigned by blank. Those policies were sent to us from—those blanks, I mean— were sent us from the Raleigh office. I had those in my possession, and had them in my possession at the time I gave those binders. There are fifty of them here; fifty in a batch; these run from fifty-one to seventy-five. When we gave a binder and followed it by issuing a policy, we de-

livered some of the policies. A good many of them told us to keep them in the bank. I delivered the policy to the insured; did not have to send it to Raleigh. It was already signed by the president and the secretary and was countersigned by Howard & Aiken, giving it effect, and I at once turned it loose. As to whether that was the usual and customary way in the course of business of Howard & Aiken, agents of the Atlantic Fire Insurance Company, will say that's the only way, the only way we did it. They sent us the policy signed by the president and the secretary before getting any application, and all we did was to countersign it. After we countersigned one of those policies, we reported to the company that we had issued a policy. I do not know exactly how many policies for the Atlantic Fire Insurance Company we issued as agents for that company during the life of our agency; one hundred or more; one hundred and six, I think. The premiums we remitted during the five months amounted to little over $1,000. That was all the net premium to them."

It is well settled that such circumstances are evidence of authority in the agent to issue the policy, and that the company is affected with notice of the making of the contract. *Grabbs v. Ins. Co.,* 125 N. C., 397.

The plan adopted for the payment of premiums by charging them against the plaintiff in his account with the bank of which the agent of the plaintiff was cashier, and then having them remitted to the defendant by its agent, does not come under the condemnation of *Folb v. Ins. Co.,* 133 N. C., 180, which holds that the insured cannot pay his premiums by satisfying a private debt due him by the agent of the company.

Upon a review of the whole record, we find

No error.

BROWN, J., took no part in the decision of this case.