# Staunton

## EASTERN SHORE OF VIRGINIA FIRE INSURANCE COMPANY, INC. v. EDWARD L. KELLAM AND EDGAR W. KELLAM.

September 22, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Warner Ames, Stewart K. Powell* and *Gunter & Gunter,* for the plaintiff in error.

*J. Brooks Mapp* and *B. Drummond Ayres,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by Edward L. Kellam and Edgar W. Kellam, partners doing business as E. L. Kellam & Son, plaintiffs, against Eastern Shore of Virginia Fire Insurance Company, defendant. The plaintiffs allege that they jointly owned a store building at Belle Haven in Acmomac county, Virginia, and the stock of goods therein; that on or about December 29, 1929, for a valuable consideration to be paid by them, the defendant, acting through its duly authorized agent, C. B. Mears, entered into a parol contract of insurance with them, by which it insured them

to the amount of $3,000 against the loss by fire of this property, the insurance being distributed $1,000 on the building and $2,000 on the stock; and that on August 6, 1930, while this contract of insurance was in force, the building and stock of goods were totally destroyed by fire.

The defendant's ground of defense was that the plaintiffs' store building and stock of goods were not insured by the defendant when they were burned.

The material evidence introduced by the plaintiffs and such of the defendant's evidence as is not in conflict therewith is as follows:

The Eastern Shore of Virginia Fire Insurance Company, herein called the defendant, is a small fire insurance company which has its home office at Keller, in Accomac county, Virginia, and does business on the Eastern Shore of Virginia. C. B. Mears was its agent in Accomac county for Belle Haven and its vicinity. Its agents were not authorized to issue policies of insurance. They were solicitors who procured applications for insurance which they forwarded to the home office for acceptance or rejection. If the insurance applied for was accepted, a written policy was issued at the home office, which was sometimes mailed direct to the applicant and sometimes given to the agent to be delivered to the applicant. If it was rejected, the usual practice was to notify the agent, who in turn notified the applicant.

In practice, the agents of the defendant did not require an applicant to make out and sign a written application. The agent got from the applicant the necessary information and then himself filled a written application on forms furnished by the company, and sent or took it to the home office. This custom was known to and acquiesced in by the company.

It was also a common practice of the defendant's agents to tell an applicant at the time he made verbal application for insurance that he was insured from that time. This practice came to the attention of the president of the com-

[4]

pany, and at a meeting of its agents held "from two to four years" before the trial of this case (*i. e.*, before June 1929) he told the agents that he wanted it understood that they had no authority to do this. But no statement was then or thereafter made to the public on this subject; and Mears, who was not present at this meeting, was never told whether he did, or did not, have the authority to make such binders. After that meeting, not only Mears, but some of the defendant's other agents continued to tell an applicant for insurance.that he was insured from the time the agent received his application.

The agents of other fire insurance companies doing business in Accomac county were accustomed to tell an applicant for insurance that he was protected, or insured, from the time he made his application; but these agents were all general agents authorized to accept insurance and issue policies, and these oral binders, when made by them were followed within a short time, usually a few days, by the issuance of a written policy. There is no evidence tending to show an established custom or practice of any insurance company or agent to carry insurance under oral contracts of, insurance for any considerable term or for any length of time except during the interim between the date of an application and the issuance of a written policy covering the risk in accordance with the application.

Defendant's agents were authorized to collect the premiums on policies issued on applications procured by them, and since 1926 the defendant has held its agents responsible for the payment of the premiums on such policies.

The plaintiffs conducted a mercantile business at Belle Haven, which is about five miles from Keller. In 1920 they insured their store building and stock of goods with the defendant for the period of one year. An agent named Turlington took their verbal application for this insurance. He did not require them to fill out or sign an application, but asked them some questions and made some notes on a blank sheet of paper. Nothing was heard by them about

the matter after they made their application until "possibly some three or four months later" they received their policy. Each year thereafter, until 1928, as their policy on this property was about to expire, a renewal policy was sent them by the defendant, but in 1928 they did not renew their policy.

The last week in December 1929, the plaintiffs wrote Mears, who had succeeded Turlington as the agent of the defendant in this territory, and asked him to come to see them as they again wanted to take out some insurance in the defendant company. When he came they made a verbal application to him for a policy of fire insurance for the term of one year for $1,000 on their building and $2,000 on the stock of goods therein; and he took out a memorandum book and made a notation of the amount of insurance applied for.

Edgar W. Kellam testified that this conversation then took place between Mears and himself: "I says, 'I suppose it is all right, we are insured by that?' He says, 'Yes, right now you are insured as far as fires are concerned.'"

Walter C. Ashby testifies with reference to Kellam's conversation with Mears at this time as follows: "They agreed upon it" (the amount of insurance), "and Mr. Mears told Mr. Kellam that he was insured, to consider himself insured."

Mears' testimony on this point is this:

"Q. * * *, when Mr. Edgar Kellam made verbal application to you for the $3,000 insurance now in question, did he ask you when that insurance would begin?

"A. He said he wanted it to start right from that day.

"Q. What did you tell him?

"A. I told him all right."

At this time Edgar Kellam called Mears' attention to the fact that they owed $34.50 on the 1927 premium, but that he, Mears, personally owed them $96.50, and asked him whether he wanted him to pay him the $34.50 then or to settle for it when he paid him the premium on the policy for which he was then applying. Mears replied: "Wait

until spring," and "we will settle for that premium together and if you owe me you pay me and if I owe you I will pay you the difference." But neither Mears nor the company have ever presented the plaintiffs with a bill for the premium on any contract of insurance for any part of the years 1929 and 1930, nor has any such premium been paid by them through a settlement with Mears or otherwise.

Mears went home, prepared an application from the notes he had taken, and on December 31, 1929, took it to the home office of the company. Mrs. LeCato, the policy clerk, was away on a vacation. Without saying anything about it to anyone in the office, he put it on her desk and left it there. But no one at the home office ever saw the application, nor did Mears ever mention to anyone in the office that he had left it there, or make any inquiry about the matter until after the fire which occurred more than seven months later.

Early in January, 1930, Edgar Kellam stopped Mears on the road and told him that they had not gotten their policy, and asked him "what is the trouble." Three versions of what Mears said in reply to this question are contained in the evidence introduced by the plaintiffs.

Edgar Kellam says: "He said, 'They are a little busy issuing policies or something like that.' And he says, 'The policy will be in here shortly."

B. L. Bundick says: "He asked about this policy and he said he had not got the policy and wanted to know if he was insured. And Mr. Mears told him that he positively was insured, that no use to worry about that, that he would look into the matter and take it up and if he had not gotten it, *to get it for him.*"

Mears testified about this conversation as follows:

"Q. What was said?

"A. He asked me about insurance, he hadn't got his policy, and I told him I attended to it, I put the application in and I guessed they were busy, the auditors were there.

\*　\*　\*　\*　\*　\*　\*　\*　\*

"Q. Did Mr. Kellam ask you whether or not he was insured at that time?

"A. I told him yes, sir; I thought he was insured, his application had been put in and they should attend to it as soon as they got at leisure."

Though the plaintiffs did not receive their policy, they made no further inquiry about it, until "one day about the middle of May," when Edgar Kellam happened to meet Mears in the road and stopped him, when, according to Kellam, this conversation took place: "I says, 'I haven't got that policy yet. What is the trouble?' He says, 'I don't know what the trouble is. I thought you had the policy before now.' I says, 'I want to know whether we are insured or not.' He said, 'Well you need not worry about the policy, you are insured any way. I had your application and I filed it just like I always file it.' "

Carey Savage, who testifies he was present at the time this conversation took place, says with reference to it: "I heard Mr. Kellam ask him about the insurance policy, that he had not gotten it and Mr. Mears seemed to be somewhat surprised and told Mr. Kellam not to worry, that he was insured if anything should happen."

Mears says that he had no conversation about this matter with anyone from the time of his conversation with Edgar Kellam in January, 1930, until after the fire.

This was the last inquiry that the plaintiffs made about the matter until after the fire. In Edgar Kellam's language, "It sort of slipped my mind. In fact, I didn't pay any more attention to it because he told me I was insured whether I had the policy or didn't get it." At no time until after the fire did either of the plaintiffs make any inquiry about this policy at the home office, or of anyone but Mears.

On the night of August 6, 1930, the storehouse and stock of goods of the plaintiffs was totally destroyed by fire. The following morning they got Mears and went with him to the home office of the defendant company, and reported the loss, claiming that they were insured by the defendant

in the sum of $1,000 on the building and $2,000 on the stock of goods. The defendant company at once denied all liability upon the ground that it had not received any application to insure the property, and had not insured it.

So far as the record shows, there were no exceptions to either the giving or refusing of any instruction. The jury returned a verdict for the plaintiffs for $3,000. The defendant "moved the court to set aside the verdict upon the ground that the same is contrary to the law and the evidence, is plainly against the weight of the evidence, and is without evidence to support it, and to enter up judgment for the defendant" or grant to it a new trial. The court overruled this motion and entered judgment for the plaintiffs. To this judgment the defendant has been granted a writ of error.

The only ground of error assigned is that the court erred in overruling the motion to set aside the verdict of the jury, and in not entering judgment for the defendant, or, at least, granting him a new trial, because Mears was without actual or apparent authority to make an oral contract with the plaintiffs for the insurance of this property which was binding upon the defendant.

The court erred in not sustaining the motion to set aside the verdict and enter judgment for the defendant.

There is no evidence in this case which tends to prove that the plaintiffs at any time had the right to assume that Mears was clothed with any greater authority than that of the ordinary general fire insurance agent, that is, of an agent authorized to accept insurance and issue policies. Whatever may have been their right, prior to January 1930, to assume that he had the authority of an ordinary general agent, after the conversation Edgar Kellam had with him early in January, 1930, they no longer had the right to so assume. In this conversation the plaintiffs were put upon notice that Mears was only a soliciting agent without authority to accept insurance for the period of time (one year) for which they had applied for it, and that their

application would have to be passed upon and the policy issued by the officers of the company. They were again put upon notice of this fact in the conversation which Edgar Kellam had with him about the middle of May, 1930.

Under modern business conditions and practice the issuance of a formal written policy is contemplated and required by both parties in practically all fire insurance transactions; and an oral contract of insurance for any considerable length of time is, to say the least, extraordinary.

In view of these facts, the apparent authority of even a general agent to make oral contracts of fire insurance is very limited; and, in the absence of specific actual authority, he has a correspondingly limited power to bind his principal by such a contract. Except, perhaps, in some cases in which the coverage is for a short term, ordinarily a general agent has apparent authority to make an oral contract of fire insurance only for some temporary purpose incident to the issuance of a formal written policy, and only for such length of time as may be a reasonable time within which to issue and deliver such a policy. This is the limit of his apparent authority in this respect in so far as it is predicated upon his actual authority to accept insurance and issue policies. *Continental Ins. Co.* v. *Schulman*, 140 Tenn. 481, 205 S. W. 315; *McQuaid* v. *Aetna Ins. Co.*, 226 Mass. 281, 285, 115 N. E. 428; *Park & Pollard Co.* v. *Agricultural Ins. Co.*, 238 Mass. 187, 130 N. E. 208; *Dresser & Son, Inc.* v. *Allemannia F. Ins. Co.*, 101 Conn. 626, 642, 643, 126 Atl. 912. See, also, *Struzewski* v. *Farmers' F. Ins. Co.*, 226 N. Y. 338, 123 N. E. 661.

If it be contended that, by reason of the custom or practice of the fire insurance business, or of his principal, an agent has an apparent authority broader than this, to sustain the contention it is necessary to prove a well established custom or practice of fire insurance companies generally in that locality, or of the agent's principal in particular, under which agents are permitted to make oral contracts of insurance which may not reasonably be said to

fall within the limits above mentioned. This has not been proven in this case; and, as Mears had no actual authority to make any kind of a contract of insurance with the plaintiffs, the greatest effect that any oral contract of insurance which he may have made with them when they applied for insurance was to insure them against loss for a temporary period not exceeding what was a reasonable time within which to issue and deliver to them a formal written policy.

It is difficult to define with precision what is a reasonable time within which to prepare, or procure, and deliver a written policy; but the basic element of it is the time reasonably necessary in the ordinary course of business for a reasonably prudent and diligent agent to accomplish the issuance and delivery of a written policy under all the facts and circumstances of the immediate case. To this may, and should, be added such time as may be reasonably required to take care of delays which may not improbably occur due to the exigencies of business and delays due to the fact that men are sometimes dilatory in their attention to business matters; and there may be added also a short period of grace, for the applicant is entitled to some latitude in this matter. But where it is contended that, in the sense this expression is here used, a reasonable time within which to prepare, or procure, and deliver a written policy extends into months rather than days, the justification of the contention must be found in the basic time element above mentioned. It cannot be sustained on the basis of the time allowances mentioned.

Applying these principles, the evidence in this case is insufficient to support a finding that a reasonable time within which to issue and deliver a written policy in this case exceeded thirty days from the date of the application therefor; and, indeed, it would be an exceptional case in which the peculiar facts and circumstances of the case could reasonably be said to operate to extend it beyond thirty days from the date of the application.

The conversations which Edgar Kellam had with Mears in January and May, 1930, did not operate to increase his apparent authority. On the contrary they operated to restrict it, for they put the plaintiffs on notice that he had no authority to accept their application and issue them the policy for which they had applied. In neither conversation did he purport to make a new contract of insurrance with them. In both of them his representations to them that they were insured related to whatever contract had been theretofore made. Whatever may have been his apparent authority at the times of these conversations to bind his principal by representations that the former oral contract was still in force, and as to the length of time for which it would thereafter remain in force, it was no greater than his then apparent authority to make an oral contract of insurance with them. It is needless, therefore, to discuss or define with precision the actual effect of these conversations, for in no event did he have apparent authority at the time of either of them to revive, or extend the duration of, the prior oral contract for a longer time thereafter than was a reasonable time within which to have the company consider their application and either issue them a written policy or refuse the risk.

The fire did not occur until August 6, 1930, when more than a reasonable time within which to have the company consider their application, and either accept it and issue them a written policy or reject it, had elapsed since even the last conversation. Therefore, any valid oral contract of insurance which Mears could have made with them for the insurance of this property had expired before the fire occurred.

What has been said above has been said without reference to the Virginia statutes providing for the supervision and regulation of fire insurance companies and the Virginia statute, chapter 256, Acts 1928, prescribing a standard form of fire insurance contract or policy and requiring the use thereof. But it is reenforced and fortified by the public

policy bespoken by these supervisory and regulatory stat-
utes; and we are of opinion that whatever oral contract of
insurance Mears may have made, or have attempted to make,
with the plaintiffs was rendered ineffective and unenforce-
able at the time of this fire by the provisions of the Vir-
ginia Standard Policy Act.

Sections 4178 and 4180, Code Va. 1919, as amended by
Acts 1920, p. 22, c. 20, provide for the examination of the
financial affairs and condition of insurance companies by
the Bureau of Insurance of the State Corporation Commis-
sion, and the suspension or revocation of the license to do
business of any such company which is financially unsound.
Section 4229 requires all insurance companies doing busi-
ness in the State to make an annual report of their financial
condition. Section 4311 provides that in making its annual
report a fire insurance company shall determine its total
liability upon its risks then in force by setting up certain
percentages of the whole premium charged on some of such
risks and of the unearned premium charged on others of
such risks; and that the same method shall be used in deter-
mining the financial condition of a company when an exami-
nation is made by the Bureau of .Insurance. Chapter 433,
Acts 1928, p. 1115, provides for the regulation of the rates
of fire insurance companies by the State Corporation Com-
mission, in the performance of which duty it is necessary
to ascertain the aggregate liability of the several companies
on their outstanding unexpired contracts of insurance.
The last mentioned act also forbids fire insurance companies
to make discriminations, and empowers the State Corpora-
tion Commission to remove them if they are made. These
statutes are predicated upon the assumption that insurance
contracts will be in writing and that accurate records will
be kept thereof; and it is essential to their due execution
that the companies shall not make and that their agents
shall not be authorized to make oral contracts to any greater
extent or for any greater length of time than is reasonably
required by the exigencies of the business and for the

orderly conduct of their business with reasonable convenience to the public.

■ Therefore, where there are such statutory provisions for the supervision and regulation of fire insurance companies, public policy requires that the contract liabilities of fire insurance companies shall not be left to the uncertainties and obscurities of parol testimony for any length of time beyond that which the exigencies of business make reasonably necessary, and that their contracts, except such as are made for a very short period, or for some temporary purpose incidental to the issuance of a written policy, shall be in writing. *McQuaid* v. *Aetna Ins. Co.*, 226 Mass. 281, 285, 115 N. E. 428; *Dresser & Son, Inc.* v. *Allemannia F. Ins. Co.*, 101 Conn. 626, 642, 643, 126 Atl. 912. See, also, *Continental Ins. Co.* v. *Schulman*, 140 Tenn. 481, 205 S. W. 315, and *Struzewski* v. *Farmers' F. Ins. Co.*, 226 N. Y. 338, 123 N. E. 661.

The General Assembly of Virginia has made statutory these requirements of public policy. Chapter 256, Acts 1928,[1] after having established the New York form "of a contract or policy of fire insurance" as the standard form for use in Virginia, then makes the following provisions in §1 thereof:

"Section 1. * * * after July first, nineteen hundred and twenty-eight, no fire insurance corporation, company and other insurer, its officers or agents, shall make, issue or deliver for use any fire insurance policy or the renewal of any such policy on property in this State, other than such as shall conform in all particulars as to blanks, size of type, context, provisions, agreements and conditions with such printed blank form of contract or policy; and no other or different provision, agreement, condition or clause shall be in any manner made a part of such contract or policy or endorsed thereon or added thereto, or delivered there-

---

[1]Section 8 of this act was amended by Acts 1930, p. 758, c. 324, but the amendment does not affect the subject here under discussion.

with, except as follows, to-wit: * * * (Paragraphs numbered first to fifth are here omitted.)

"Sixth. Contracts for temporary insurance may be made for a period not exceeding thirty days, which shall be deemed to include all of the provisions of the standard policy with such agreements and riders in writing added thereto as may be necessary to effect valid insurance of the described property, and such other agreements not inconsistent with, or a waiver of any condition or provision of the standard policy, as may be expressed in such contract, except that the cancellation clause of the standard policy shall be superseded by the provisions of any such temporary contract regulating cancellation or termination of insurance thereunder, and except that where any such contract for temporary insurance shall specify the hour of the day when liability shall commence, such statement of time shall supersede the provisions of such standard fire insurance policy to the contrary, and such statement shall be deemed to refer to standard time at the place of loss or damage."

When this act is read in the light of the above cited statutes providing for the supervision and regulation of fire insurance companies, it provides by implication that all oral contracts of insurance shall be void and unenforceable, except such as fall within the provisions of the sixth paragraph of section 1, which provides for "contracts for temporary insurance * * * made for a period not exceeding thirty days." *Salquist* v. *Oregon Fire Relief Ass'n*, 100 Ore. 416, 197 Pac. 312; *Pralle* v. *Metropolitan L. Ins. Co.*, 346 Ill. 58, 178 N. E. 371, affirming 252 Ill. App. 460; *Munhall* v. *Travelers Ins. Co.*, 300 Pa. 327, 333, 150 Atl. 645; *Schilbrek* v. *Inter-Ocean Cas. Co.*,[2] 180 Wis. 120, 192 N. W.

[2]But see *Milwaukee Bedding Co.* v. *Graebner*, 182 Wis. 171, 196 N. W. 533, a fire insurance case in which in the absence of a provision similar to paragraph 6 of the Virginia act (Acts 1928, p. 765, c. 256) the court held that the Wisconsin act providing for a standard form of policy did not render void a temporary oral contract of insurance which is made for some purpose incident to the issuance of a written policy.

456. See, also, *Continental Ins. Co.* v. *Schulman,* 140 Tenn. 481, 494, 205 S. W. 315.

Under this statute any valid oral contract of insurance which Mears could have made with the defendants was limited to a term not exceeding thirty days; and under any view which can be taken of this case had expired long · before the fire.

The following cases are sometimes cited as authority for the statement that the enactment of a statute establishing a standard form of fire insurance contract or policy and requiring its use in all cases does not by implication render oral contracts of insurance void and unenforceable. *Lea & Adcock* v. *Atlantic Ins. Co.,* 168 N. C. 478, 84 S. E. 813; *Republic Ins. Co.* v. *Poole* (Tex. Civ. App.) 257 S. W. 624; *Milwaukee Bedding Co.* v. *Graebner,* 182 Wis. 171, 196 N. W. 533; *Kidder* v. *Hartford Acc. & Ind. Co.,* 126 Wash. 478, 480, 218 Pac. 220, 221; *National Lib. Ins. Co.* v. *Milligan* (C. C. A.), 10 F. (2d.) 483 (a case decided under the laws of the State of Washington) ; *Hicks* v. *British Amer. Assur. Co.,* 162 N. Y. 284, 56 N. E. 743, 48 L. R. A. 424.

But in each of these cases the statute under consideration was materially different from the Virginia statute, chapter 256, Acts 1928. In none of them did the statute under consideration contain a provision similar to paragraph 6 of section 1 of the Virginia act above quoted; and in North Carolina, Texas and Wisconsin the statute, after imposing a penalty on any insurer or agent making a contract of insurance in violation thereof, expressly provided that a policy issued in violation of the statute should, nevertheless, be binding upon the company issuing it. Code N. C. 1927, §§6436, 6439; Rev. Stat. of Wis. 1898, §§1941-42, 1941-43, and 1941-65; Rev. Stat. of Tex., arts. 4876-4904, particularly article 4896; Laws of Wash. 1911, c. 49, p. 264, §§187-191.

The following cases also are sometimes cited in support of the same statement. *Goodhue* v. *Hartford F. Ins. Co.,* 175 Mass. 187, 191, 55 N. E. 1039, 1041; *De Cesare* v. *Metropolitan L. Ins. Co.* (Mass.) 180 N. E. 154; *Robertson*

v. *Burstein,* 104 N. J. Law, 218, 141 Atl. 92. However, what was really decided in these cases was that a statute prescribing and requiring the use of a standard form of policy, but containing no provision similar to that of the Virginia statute with reference to temporary contracts, did not prohibit or render void and unenforceable a temporary oral contract made for a purpose incident to the issuance of a formal written policy. Also upon examination of *Milwaukee Bedding Co.* v. *Graebner,* 182 Wis. 171, 196 N. W. 533, 538, *supra,* it will be seen that temporary oral contracts incident to the issuance of formal written policies were what the court had in mind in what is said in that case.

In *Chambers* v. *Home Mut. Ins. Ass'n* (Iowa), 242 N. W. 30, 33, 34, though the court seems to treat it as settled that a temporary oral contract made as a preliminary to the issuance of a written policy of insurance is valid, it says: "Whether there can be oral insurance for a term, as distinguished from a preliminary period before the issuance of the policy, under the present statute requiring written policies, we do not now decide."

For the reasons stated the judgment of the trial court will be reversed, and judgment here entered for the defendant.

*Reversed.*

HUDGINS, J., concurs in result.

BROWNING, J., dissenting:

Not being in accord with the majority opinion in this case I submit my views and reasons for such attitude.

The plaintiffs, by notice of motion, sued the defendant for $3,000.00 claimed to be due by reason of an oral contract of fire insurance. The defendant is a corporation engaged in writing fire insurance in the counties of Accomac and Northampton, Virginia, and the plaintiffs, partners,

composing the firm of E. L. Kellam & Son, are merchants dealing in general merchandise at Belle Haven, in the county of Accomac. The defendant had insured their store building and fixtures and stock of goods since 1920. The policy for such insurance had been renewed each year until 1928, when the project of relocating the highway upon which their building was situated was agitated which, if effected, would result in their discontinuing business or moving their store, and therefore they did not renew the policy for the years 1928 and 1929.

During the last week of December, 1929, Edgar Kellam, of plaintiffs' firm, wrote a letter to Charles B. Mears, the defendant's agent in that locality, and asked him to come to Belle Haven to see about insuring their property for the ensuing year. In response to this letter Mears went there on the last Friday in December and after agreeing on the amount of insurance, $1,000.00 on the building and $2,000.00 on the fixtures and stock of goods, the agent made a memorandum of the terms in a note book which he had for that purpose. The insurance period was one year, to take effect immediately, and the premium was $50.70. With this data the agent made out the application on one of the defendant's blanks, with which he was supplied, which contained the usual and necessary information for writing and issuing the policy.

Edgar W. Kellam testified that the agent assured him that the property was at once insured. Walter G. Ashby, who was present, testified that the agent, Mears, told Kellam that he was insured for twelve months and to consider himself so. Some two weeks later Mears stopped by the plaintiffs' store and Kellam told him that he had not received the policy and then he offered to settle a balance due on a former premium and the premium for the policy in question, Mears at the time being indebted, personally, to the firm in the sum of $96.50. Mears told Kellam that the policy would be in shortly, and that the settlement for the premium could be deferred until spring. Byron L. Bundick,

a witness for the plaintiffs, who was present, confirmed this incident and conversation and also testified that Mears said to Kellam that he was positively insured and that he would see about getting the policy for him.

Kellam testified that again in May, 1930, he met Mears on the highway near his store, Mears being in an automobile, and he stopped him and said that he had not received that policy and that Mears seemed surprised and said he thought he had gotten the policy before that, but that he need have no worry he was insured; that he had filed his application as he had always done. Carey Savage, another witness for the plaintiffs, who was present, confirmed this statement.

Mears, the defendant's agent and brother-in-law of its president, testified for the plaintiffs and corroborated the statement of Kellam as to the effecting of the insurance at the December meeting and further stated that he filled in the application and delivered it to the company on December 31, 1929, by placing it on the desk of the policy clerk, Mrs. LeCato, as was his custom, who was absent at the time, and that he had made some collections of other premiums, which he turned in to Mr. Wessels, secretary and treasurer of the company; that Mr. Wessels' desk was the first one he reached upon entering the office; his statement was somewhat at variance with that of Kellam and Bundick in that he stated that he told Kellam at their January meeting that he *thought* he was insured, that his application had been put in and they should attend to it as soon as they were at leisure. He did not recollect the meeting in May. He further testified that Kellam told him that he wanted the insurance to start from the day in December when the contract was made and he said "all right." Mears also testified that when an application was refused he was notified and that he notified the applicant. He said also that the company had never informed him that he was without authority to tell applicants for insurance that they were insured from the time they made application to him. He said that he

solicited insurance, collected premiums; that sometimes he delivered policies and at other times they were sent to the insured by the company; that he was held responsible for premiums for policies written by him and they were charged to him; and that he expected to collect the Kellam premium in August.

The witnesses, Hyslop, Rice, Byrd and Nock testified, in substance, that it was generally understood in the district in which Mears operated that he and the other local agents of the defendant had authority to bind the company at once when immediate insurance was desired and requested. Hyslop had as many as sixty houses insured in the company and all of them dealt with Mears.

Three witnesses for the defendant, who were its local agents in other districts, testified that they had authority to bind the company for immediate insurance. They were not in agreement as to the length of time the binding was to remain in effect but they said that they were expected to get in touch at once with the company in relation to the matter.

About a year prior to the time the contract was made by Mears with the plaintiffs Mr. S. W. Ames, president of the company, at an agency meeting, told the local agents that it had come to his knowledge that they were informing applicants for insurance that it became effective at once and that such practice must cease; that they could not bind the company without notifying it and obtaining a policy. Mears said he was not at this meeting and that at no meeting when he was present was anything said by Mr. Ames which in any way explained or limited or prescribed the authority of the agents. There was evidence that the instructions given at this meeting were not made known to the public in any way.

In the early part of August, 1930, the building and its contents was destroyed by fire, without the fault of the plaintiffs, the owners. They at once went to see the agent, Mears, with whom they always dealt and who was, to all

intents and purposes, the company to them, and notified him of the fire and they went to the company's office at Keller, to notify the officials and to find the policy. It was not to be found and Mr. Wessells, secretary and treasurer, said he had no knowledge of the application, had never seen or heard of it and told Mears that he was lying when he said that he had placed it on Mrs. LeCato's desk. Mears protested that he had done so. Two trials were had, the first resulting in the jury's disagreement and the second in a verdict for the plaintiffs for $3,000.00, which the court refused to set aside as contrary to the law and the evidence, which action of the court is the sole assignment of error.

There is evidence on the part of the defendant tending to show inconsistent statements of the agent, Mears. The evidence is conflicting in many particulars, making the case, it seems to me, peculiarly one for the determination of a jury. There was much testimony, unimpeached, which justified the finding that the defendant's agents, particularly Mears, were in the habit of assuring applicants that their insurance was effective or binding immediately upon verbal application therefor; that the agents apparently had that authority; that the defendant knew or ought to have known of such habit or custom, because it generally prevailed; that the public contracted with reference to and relied upon it. It is true that seven months elapsed between the inception of the contract and the fire without the issuance of a policy, nor was the policy ever issued, but can we say as a matter of law, that this incident, under all the circumstances of the case, is one that should preclude the recovery of the plaintiffs, in the face of the jury's verdict in their favor. I think that the reasonableness or otherwise of the matter in this case is a question for the jury.

"The authority of the agent effecting the contract may be determined by implication as well as from express written authority." *Tucker* v. *Farmers' Mutual Fire Ass'n*, 71 W. Va. 690, 693, 77 S. E. 279, 280.

*Vance on Insurance,* p. 306: "The possession of authority, whether actual or apparent, is a question of fact, not of words. As shown above, the question whether any given act of an agent binds his principal is to be decided by determining whether the third party had reasonable grounds for believing, under all the facts of the case, that the principal had authorized that act. If such reasonable ground does exist, the principal is bound, whether the agent has been entitled 'general agent,' 'solicitor,' or 'president.' It is easily possible that in reference to some particular transaction a special agent may be vested with all the powers of the insurer, and it is not impossible that a figurehead president should be stripped of all powers."

And at page 310: "'Local' agents are usually special agents, in the sense of having only limited authority, but local agents may have general powers. In this case, as in all others of agency, the facts govern. If the facts of any case show that the agent was actually possessed of the power exercised, or that the third party had reasonable ground for believing that he was possessed of such power, the principal shall be bound; otherwise he will not. It makes not one particle of difference what may be the designation of the agent."

I here quote from plaintiffs' brief which I think is very pertinent and forceful: "In the case of *Croft* v. *Hanover Fire Insurance Company,* 40 W. Va. 508, 21 S. E. 854, 857, 52 Am. St. Rep. 902, it was said: 'The agents agreed with the plaintiff, for a given consideration, to insure a particular house owned by the plaintiff, in a sum which the agent was to and did fix, and for a period of time covering the date of the loss by fire. Nothing remained to be done but issue the policy, which the agent promised to do. These things he himself proved. Both parties understood that the plaintiff was insured. Every element was final to base that policy on. The agents were authorized to issue it. His own memorandum told him every single element from which to issue it, except the name of the insured; and, had he issued

it in the wrong name, the mistake could be corrected, and a suit maintained upon it. The only thing wanting is the policy to perfect the insurance. Whose fault that it was not insured? Where is the plaintiff, in fault or default? To decide the case against the plaintiff, his house is lost, without the indemnity he fairly contracted for; to decide it against the defendants is only to make them do what they fairly contracted to do. The defense set up at first blush inspires some questions but, on consideration, it becomes a figment, which withers away. Courts must not let insurance companies evade their policies through mere technicalities. They must be treated fairly, and only held up to their fair engagements. They are very valuable institutions, deserving patronage and encouragement; but when their contracts of indemnity prove worthless, for unsubstantial reasons, to those who are in distress and poverty from the waste of fire, against which their prudence sought to provide, it derogates from the efficacy of the policies and the confidence of the public in fire insurance.'

"It is conceded that the agent in this case was a general agent, but the principle applicable is the same. Here there was a contract of oral insurance; no policy was ever issued. In the case at bar we have a contract of oral insurance made with an agent, who was recognized in the community to have the authority to make such a contract, who represented a company whose president had been informed his agents were making such contracts, who instructed some of them secretly to desist from doing so but gave no notice to the public of this restriction—in fact, a contract made with an agent having every power that the agent in the case of *Croft* v. *Hanover Fire Insurance Company, supra,* had, so far as the public was concerned except that he did not actually write policies himself."

It is urged that §4305a of the Code of Virginia 1930 requires all insurance contracts of insurance companies doing an insurance business in Virginia to be in writing, incorporated in a policy or like writing. We do not so con-

strue this statute. It does, among other provisions, not pertinent here, provide that all fire insurance policies shall conform to the provisions of what is known as the "Standard Fire Insurance Policy." There is no inhibition of an oral contract of insurance. The precise question was raised in the case of *Lea & Adcock* v. *Atlantic Fire Ins. Co.,* 168 N. C. 478, 84 S. E. 813, 815, in which it was said: "Is a parol contract of insurance or a memorandum of the contract, called a binder, valid, although a standard form of policy has been adopted by statute? In the absence of a statutory prohibition the great weight of authority is in favor of the validity of a parol contract of insurance." The following authorities are cited: 19 Cyc. 600; *Vance on Insurance,* 155; *Commercial Mutual Marine Ins. Co.* v. *Union Mutual Ins. Co.,* 19 How. 318, 15 L. Ed. 636; *Franklin Ins. Co.* v. *Colt,* 20 Wall, 560, 567, 22 L. Ed. 423; *Phoenix Ins. Co. of New York* v. *Ryland,* 69 Md. 437, 16 Atl. 109, 1 L. R. A. 548, 549; *Home Ins. Co.* v. *Adler,* 71 Ala. 516, 524; *Hartford Fire Ins. Co.* v. *Wilcox,* 57 Ill. 180, 182; *Campbell* v. *American Fire Ins. Co.,* 73 Wis. 100, 108, 40 N. W. 661; *Walker* v. *Metropolitan Ins. Co.,* 56 Me. 371, 378; *Floars* v. *Aetna Life Ins. Co.,* 144 N. C. 232, 235, 56 S. E. 915. See, also, *Massachusetts Bonding & Ins. Co.* v. *Vance,* 74 Okla. 261, 180 Pac. 693, 15 A. L. R. 981, and cases cited therein.

A ruling of a court to the effect that any arbitrary period of time is such time within which an insurance company must issue a written policy, after the receipt of the application for such insurance, or that such period is reasonable and no period in excess of it is reasonable, is a regulatory act upon the part of the court in respect to the business of insurance companies, and is an usurpation of their rights in their transactions with the public. It is also, I think, an invasion of legislative authority.